THE STATE EX INF. NORTH TODD GENTRY, Attorney-General, v. AMERICAN CAN COMPANY.—4 S. W. (2d) 448.

Court en Banc, March 17, 1928.

*North T. Gentry,* Attorney-General, and *Boyle & Priest* for rela-
tor.

*Ralph & Baxter* and *Hostetter & Haley* for respondent.

WHITE, J.—This proceeding in quo warranto, begun by the Attorney-General, has for its purpose to oust respondent from its corporate franchises and to declare the same forfeited, the petition alleging non-user.

The petition of relator was lodged with the clerk of this court December 2, 1925, but for some reason was not marked "Filed" until December 11, 1925. The respondent, March 10, 1926, filed return, denying the allegations of the petition, except such as it specifically admitted to be true; alleged compliance with the statute in filing reports; that the State of Missouri is estopped to visit any penalties upon it; that the relator is "being imposed upon and was induced to institute this proceeding by the cunning, sophistry, selfishness and subterranean machinations of a foreign corporation, the American Can Company of *New Jersey*, whose purpose is to drive out of this State all competitors."

Further, it is alleged in the return that since the American Can Company of New Jersey entered the State and conducted a similar business it has been engaged in a systematic and frantic effort "to

secure the ownership of all the capital stock of respondent, with a view to exercising a monopoly of the business which respondent is authorized to conduct under its franchises.'' The relator filed a reply to the return, putting in issue a number of facts alleged, and averring in detail many facts affecting the situation, including misuser as well as non-user.

The petition, return, and reply are of considerable length, containing many allegations of facts and denials about which finally there was no dispute, and other facts disputed which it is more convenient to consider in connection with the report of the special commissioner.

Hon. Frank Hollingsworth, of Mexico, Missouri, was appointed by this court, March 10, 1926, to take testimony in the case, with full power for that purpose, ''and to report such testimony to the court, together with his findings of fact and conclusions of law therein.''

The commissioner accordingly took evidence, and August 3, 1927, filed his report, finding in the main the disputed facts in favor of relator; that the respondent by reason of non-user and misuser of its corporate powers had forfeited its rights to them; he recommended that the charter of the American Can Company of Missouri be forfeited. Respondent filed exceptions to the findings of fact and conclusions of law. The matter was argued before Court en Banc and submitted.

The respondent was incorporated in 1889, as a manufacturing company, under the name of The St. Louis Can & Canning Company, with a capital stock of twenty thousand dollars, divided into two hundred shares of one hundred dollars each, and the purpose was to engage in the manufacture and sale of tin cans, tinware and packers' supplies. In April, 1891, the name of the corporation was changed to the American Can Company.

It failed to comply with the statute passed in 1891, which required incorporated companies to report annually to the Secretary of State the location of its principal office, the name of its principal officer, amount of earnings, cash value of its personal property, etc., under penalty of a fine of not less than a hundred nor more than a thousand dollars for a failure.

This act was repealed and an act similar in import passed in 1893. No report under that act was filed by respondent for fourteen years. The last meeting of its board of directors under its then management, was held in 1894. In 1896 the Circuit Attorney of St. Louis, filed suit against the American Can Company to recover the penalties provided by statute for failure to make reports to the Secretary of State, and the sheriff found no one upon whom to make service. It had no plant, no office, no assets, no credit.

In 1908, all the stock of that corporation was bought by Frederick L. Westerbeck. At this point the Columbia Can Company comes into the play. It was incorporated in 1902 for the purpose of manufacturing tin cans, packers' supplies, etc., with a capital of sixty thousand dollars, divided into six hundred shares of the par value of one hundred dollars each. Mr. Frederick L. Westerbeck owned five hundred and twenty shares, and his two sons, Emil J. Westerbeck and Frederick H. Westerbeck, owned the remaining eighty shares. The Columbia Can Company was doing a prosperous business when Westerbeck, in 1908, purchased the stock of the American Can Company. The way in which he came to buy the stock was this: Charles B. Emmerich was employed by the Columbia Can Company and working at its plant. He was the last elected president of the American Can Company of Missouri, and owned all the stock. One Mr. Rudolph was vice-president of the American Can Company of New Jersey, a corporation with a capital of a hundred million dollars and doing business in many cities. He came to Mr. Emmerich at the Columbia Can Company plant for the purpose of buying the stock of the American Can Company of Missouri. The New Jersey company, in April, 1908, had applied to the Secretary of State, then John E. Swanger, to obtain license to do business in Missouri under its name, the American Can Company. Mr. Swanger's letter is in the record, in which he said that under the statute he was prohibited from issuing a license because another corporation of the same name appeared, meaning the American Can Company of Missouri. Mr. Swanger further suggested in the letter that if it could be shown by affidavit of the president or secretary of the American Can Company of Missouri that it had ceased to do business and no longer was a corporation, he would admit the American Can Company of New Jersey to do business in the State under its own name. Thereupon Mr. Rudolph sought out Mr. Emmerich for the purpose of buying the stock of the American Can Company of Missouri. What occurred at their conference was related in Mr. Westerbeck's account of what Mr. Emmerich told him, to the effect that Mr. Rudolph offered Emmerich five or perhaps ten dollars for his franchise and stock, and Emmerich got mad about it, threw his hat on the floor, swore he was not a beggar, and offered to give the stock to Westerbeck. Westerbeck declined the offer and finally paid Emmerich $250 for that stock. Afterwards the American Can Company of New Jersey attempted several times to buy the stock of the American Can Company of Missouri from Mr. Westerbeck, beginning with an offer of two thousand dollars and gradually raised the price to three thousand, five thousand, fifteen thousand, and finally to twenty thousand dollars in 1925. Those offers were refused.

In the meantime the American Can Company of New Jersey had incorporated a subsidiary company in Missouri, operating under the name of the Missouri Can Company, and was a competitor of the Columbia Can Company in the same line of business. The purpose of the American Can Company of New Jersey was to buy the American Can Company of Missouri, forfeit its franchise, dissolve the subsidiary, the Missouri Can Company, and obtain a license to do business in Missouri in its own name. From its immense capital and its extensive business we may infer that its corporate name was a valuable asset. One reason advanced for the desire to operate in Missouri under the same name was to save expense and trouble in the accounting department—keeping one set of books, instead of two, and other economies. The relator offered evidence tending to show that Mr. Westerbeck, in those negotiations, manifested a readiness to sell if the American Can Company of New Jersey would buy his Columbia Can Company stock. In that case Westerbeck would "throw in" the American Can Company of Missouri. Mr. Westerbeck and his son, who also testified, denied that any such proposition was made. It was alleged in the petition and not specifically denied in the return, that in 1908 Emil J. Westerbeck filed a statement with the Secretary of State that he was secretary of the American Can Company of Missouri; that it had at all times maintained a corporate existence and "now desires to engage again in active business." Notwithstanding that expressed desire, the Westerbecks filed annual reports with the Secretary of State, giving the amount of the capital stock of the American Can Company as twenty thousand dollars, the par value per share at one hundred dollars, and added this statement to the report:

"This corporation is kept in existence for charter only; not operating."

In his testimony he frankly admitted that the only purpose of filing reports was to keep the franchise alive. This was also testified to by Emil Westerbeck.

I.   The first point made by respondent in its exceptions to the commissioner's report is that under the pleadings the matter of the misuser of the corporate franchise is not in issue. The petition alleges only a *non-user* for a matter of thirty-two years. In re-ply to the allegations of the return the petitioner avers facts constituting a misuser. The point is that a judgment can be rendered only on facts pleaded in the petition, and a ground for relief pleaded in the reply cannot be considered.

There is no doubt about the correctness of that rule. But, as stated above, the return alleges that the relator was imposed upon by the

American Can Company of New Jersey, who is a competitor of respondent in this State, and the proceeding was instigated by it, for the improper purpose of stifling a smaller competitor in this State.

The reply denies such purpose and alleges that after an entire suspension of business from 1894 until December, 1925, the American Can Company of Missouri attempted to maintain a corporate existence for the purpose of excluding the American Can Company of New Jersey from prosecuting its business in Missouri and compelling that company to buy the property of the American Can Company of Missouri, and the Columbia Can Company owned and operated by the same persons.

The return also alleges affirmatively that a proper user of the corporate franchises had begun before this suit was instituted. The reply denies that such user was in good faith, and alleges that it was not for any lawful purpose. The effect of this is that the alleged user was not a user at all; notwithstanding the ostensible corporate activities alleged by respondent to have begun, the non-user in fact continued. Evidence to that effect was competent to show a continued non-user.

Further, the relator, from the very beginning, in making out its case introduced evidence tending to support the allegations of misuser. Technically this evidence was only competent under the pleadings in rebuttal; but it was offered and received without objection as if the allegation of misuser was properly alleged in the petition. At most it was a mere variance, and since it went in without objection the respondent now is not in position to claim that the allegations of forfeiture for misuser were not pleaded in the proper place. [Litton v. Railroad, 111 Mo. App. 140; Bammert v. Kenefick, 261 S. W. 78, l. c. 82; Schneider v. Railway Co., 238 S. W. 468, l. c. 473.] There was no claim of variance at the time and no objection to the proof.

II. The commissioner found as a fact that after a meeting of its board of directors in 1894, the respondent went completely out of business and until 1908 was unofficered and unmanned, and to all intents and purposes a defunct corporation with no intention on the part of anyone to bring it to life again; that down to the filing of this suit in December, 1925, the respondent had no assets, no credit, no place of business and no bona-fide intention of engaging in business. The finding is not specifically in that form, but to that effect. Respondent challenges that conclusion.

As noted in the above, Frederick L. Westerbeck bought the stock of the respondent in 1908 for $250. He testified that it had no capital when he bought it, but it owned some now—machinery; but this machinery was loaned to it by the Columbia Can Company. He

didn't know whether the American Can Company paid the Columbia Can Company any rent for the use of the machinery or not, although he owned *both* companies. The American Can Company plant was on property rented from the Westerbeck Realty Company, which was also controlled by Westerbeck. He could not say what rental, if any, respondent paid to the Real Estate Company. Some machinery had been purchased, but it was paid for by Mr. Westerbeck and bought in his name. The borrowed machinery in the plant was old, had to be discarded and thrown away.

At the time of the trial there was to the credit of the respondent in the Mound City Trust Company the sum of $105.75. This was supplied to it by Mr. Westerbeck. Respondent had no money except what he loaned it. Thus the Westerbecks had the two plants—the Columbia Can Company plant and the American Can Company plant. The employees of the latter were former employees of the former; the only money respondent had was loaned or given to it by Frederick L. Westerbeck, and with no stipulated interest; and no notes were shown. The respondent owed Mr. Westerbeck and the Columbia Can Company for absolutely every particle of property it possessed, if it possessed any. It purchased some materials from the Columbia Can Company; it filled some orders for the Columbia Can Company, and sold some products to the Columbia Can Company, but all these activities occurred after this suit was brought.

The petition was marked "filed" by the clerk of this court December 11, 1925. The next day, perhaps, Mr. Westerbeck saw a notice of it in the papers. A set of books was thereafter opened, and Mr. Westerbeck began to put money into the American Can Company. The first entry on the journal of the American Can Company is dated December 19, 1925, and relates to rentals and repairs. The first entry on the cash book of the American Can Company was in January, 1926. These two fresh, unused books are filed with the record. No work was done and no machinery installed until after this proceeding was begun. Mr. Westerbeck in explaining that was asked this question:

"Q. It has no capital though except the nominal paper capital, has it? A. It has my name though."

As to the credits of the company, he said: "My name would establish a credit." He was asked what security he had for the money loaned. He answered, "Nothing." Then these questions and answers:

"Q. It had no capital. It had no credit. It had no business? A. It can get all the credit it wants with my name back of it.

"Q. I say the company itself had no assets, had no business, had no credit? A. We had no reason to ask for it since I represent it. My word was good."

The only attempt to show that the American Can Company had credit was the fact that it was owned and managed by Mr. Westerbeck. It had only his personal credit. It had no good will because it had done no business.

III. The commissioner found that the activities of respondents in beginning to do business were mere pretense and not made in good faith and were self-serving in their purpose. This conclusion is challenged by respondent, and that requires that we consider the evidence upon which the commissioner based that conclusion.

Frederick L. Westerbeck testified:

"Q. You were trying to keep the American Can Company (of New Jersey) out of Missouri, are you not? A. They have been trying to scoop us up (evidently meaning the efforts to buy the American Can Company). . . .

"Q. They could not do business in the name of the American Can Company here could they? A. No, they found out they could not do that, too.

"Q. So you held this charter of the American Can Company of Missouri for the purpose of keeping them out of Missouri? A. Well, there are two reasons.

"Q. Well, wasn't that one reason? A. No, I didn't exactly want to keep them out, but I didn't want to give up the charter for a little of nothing.

"Q. Didn't you know as long as you held that charter here the American Can Company of New Jersey could not come in here and do business? A. Sure, I know that.

"Q. And that was the reason you held it, wasn't it? A. I held it for the reason I didn't want them to do it. Yes, sir. I didn't want them to put me out of business here."

When again asked if he knew that the American Can Company of New Jersey could not get a license to do business in the State of Missouri as long as the American Can Company of Missouri was in existence, Mr. Westerbeck answered:

"Well, I know this much, I had charge of the American Can Company's plant.

"Q. Answer my question, yes or no. A. Well, I knew that they could not do business here with this charter in that name. I knew that.

"Q. You say you knew that? A. Yes, sir.

"Q. You bought it for that purpose, didn't you? A. Well, I didn't at that time think there was anything to it. . . .

"Q. You wanted to keep the American Can Company of New Jersey out of the State of Missouri and from doing business in its name in the State of Missouri, didn't you? A. Why, sure."

Yet Westerbeck advanced some other reasons in attempting to explain why he held on to the American Can Company stock. At that time there began to be a great demand for what is called "sanitary cans," sometimes called the packers' line. They were used for canning malt syrup which could be used for "home brew." The manufacture of those cans required new and different machinery. It was a business done by the American Can Company of New Jersey and their subsidiary company, the Missouri Can Company. But neither Mr. Westerbeck nor his son, in all their voluminous testimony, make any reasonable explanation why that business could not just as well or better have been done by the Columbia Can Company which Mr. Westerbeck and his son owned.

The reason the American Can Company of New Jersey wanted to acquire the charter of the Missouri Can Company of the same name was because it would save expense in bookkeeping, making tax returns, and the like. The same reason should have suggested to the Westerbecks the propriety of doing all their business under one name. It is argued by respondent's counsel that the commissioner in his findings on that subject didn't know anything about the can manufacturing business, while the Westerbecks did. It is not required to know anything about the can manufacturing business to know that the operation of two small establishments under two different corporate names and records would be more expensive than operating them both under one name. It would mean one set of books instead of two; one annual report instead of two to the Secretary of State; one set of officers instead of two. Half of the number of meetings, of records, and of bookkeepers.

Mr. Westerbeck advanced this reason: that he didn't equip the Columbia plant for the purpose because, "Well, we were afraid to go into it." Thus, an established company with an established business, assets, good will and credit, would have caused less risk to Mr. Westerbeck himself, individually, in starting a new line, than if it were started by an unknown company; a company without credit which he had to back up all the time. That was his reason.

This question was asked of him:

"Q. Could not you buy the equipment for the Columbia Can Company just as well as for the American Can Company of Missouri? A. No, we found that the American Can Company of New Jersey controlled that trade on long-time contracts, three to five years, and we hesitated to put in a lot of machinery and then not be able to go on in business."

We are unable to discover any reason. in that. Westerbeck and his sons owned the Columbia Can, Company, and all the stock in it; they owned the American Can Company of Missouri and all the stock in it; it was exactly the same concern. Neither he nor his son attempted to furnish any rational explanation of any advantage in operating under two names and through the instrumentality of two corporations composed of the same individuals.

In making his annual reports to the Secretary of State, in which he said the corporation was kept in existence for the charter only and was not operating, he gave the par value of the stock in the American Can Company of Missouri at a hundred dollars and the *actual* value at a hundred dollars. That statement of the actual value could not have been true. He paid two hundred and fifty dollars for the total stock. The actual value required by the statute of. course means market value. He explains in this way: ''A. We think it is worth that much.

''Q. Because of its charter? A. Yes, sir.

''Q. It had no assets? A. No, sir.

''Q. It hadn't a dollar's worth of property? A. No, sir.

''Q. No debts? A. No, sir.

''Q. Not doing business? A. No.

''Q. Yet its capital is worth twenty thousand dollars? A. Yes, sir.

''Q. How do you figure that? A. Because it has that value to any can-maker that is engaged in the can business.''

On further questioning, to express his exact idea, he said:

''Q. What do you mean by actual value? A. *The officers' knowledge of the can business is worth the money to the corporation.*

''Q. To a corporation not doing anything? A. Yes, sir.''

Now, the market value of the corporate stock would be based upon what it would sell for. It could not sell his knowledge along with the stock. This officers' knowledge, which he regards as the element of value in the stock, had nothing whatever to do with the value of the assets. That knowledge would go with any other company that he might choose to organize. In selling this stock of the American Can Company of Missouri they sold it divested of that particular value. Its actual value would be just the fees and expenses necessary to organize a new corporation. The American Can Company of Missouri had had no business, no credit, no assets, no good will. It could not have a good will unless it had a trade. It had no selling value at all if it had not been that the New Jersey Company desired to purchase it. It was worth nothing to anybody else.

It is claimed by respondent that they had contemplated this new line of business for several years, and during the fall, and perhaps in

the summer of 1925, they began to feel out the situation, to talk to possible customers, endeavoring to find out what the prospect of a trade in the new kind of can would be. We do not in that testimony find anything indicating that those investigations necessarily pertained to business which they expected the American Can Company to do. The investigations and negotiations were made by Emil Westerbeck himself as an individual. If he gained any information it was just as valuable to the Columbia Can Company as it was to the American Can Company.

The elder Westerbeck, in advancing the money to the American Can Company, endeavored to keep the matter concealed, with no explanation as to why the public should not know the exact state of affairs. When asked by relator's counsel about the books of the American Can Company, he said:

"The money advanced by me is not entered at all. I kept that to myself; I didn't want anybody to know anything about that. That is my own affair and *I didn't let the Columbia Can Company know anything about it.*

"Q. You are the president of the Columbia Can Company? A. Yes.

"Q. And you are the owner of all the stock in the American Can Company? A. Yes.

"Q. And you didn't want the Columbia Can Company to know anything about what the American Can Company of Missouri was doing, is that the idea? A. I figured that it was my own personal money, and I could do with it what I liked. I didn't have to ask anybody."

Such are the explanations of Westerbeck, which we are asked to accept as evidences of good faith. Westerbeck himself *was* the Columbia Can Company and also the American Can Company. As an individual he did not want himself as the Columbia Can Company to know what he himself was doing with the American Can Company. At another point in his testimony he was asked in relation to this money:

"Q. Why did you go that roundabout way to loan money to the American Can Company of Missouri? A. Why?

"Q. Yes. A. Because I had the money to loan.

"Q. You had the money to loan them? A. Yes, sir.

"Q. And you preferred to do it in that indirect way? A. Yes, sir."

In consideration then of the real reason why the Westerbecks wanted the stock of the American Can Company of Missouri, as frankly stated by Mr. Westerbeck, and the absurd explanation advanced for operating another company, with the fact that they obtained in-

formation that this suit was filed December 12, 1925, opened their books after that and actually began the equipment and manufacture of some portions of the cans in January following; that the plant was rented from Mr. Westerbeck's own company without any stipulated rental; that it was financed with his own money without any record of it or any stipulated interest; that the machinery for it was loaned by the Columbia Company with no stipulated rental; there is ample evidence for the finding by the commissioner that the alleged activity in conducting the business was not in good faith, but was done for the sole purpose of keeping the American Can Company of New Jersey from doing business in Missouri in its own name.

Further, this activity was not merely to keep out a competitor. The New Jersey Company was already competing with the Columbia Can Company and had been for years through its subsidiary company, the Missouri Can Company. There was nothing in the evidence to show that the competition was not just as keen as it would have been if the New Jersey Company had operated in Missouri under its own name; nothing to show that by operating in Missouri under its own name it would have been "eating up" the Columbia Can Company or endangering its prestige. The work pretended to be done by the American Can Company of Missouri was only as an aid to the Columbia Can Company; it was really the Columbia Can Company, which was to operate one of its plants as the American Can Company for the purpose mentioned.

The evidence supports the finding that the respondent ceased to do business in 1894, and had never resumed actual business up to the time the suit was brought.

The specific findings of the commissioner are:

"That the Westerbecks purchased the stock of the American Can Company of Missouri in 1908, for the primary purpose of exacting a tribute from the American Can Company of New Jersey for the privilege of qualifying to do business in Missouri under its own name;

"That said corporation has never functioned since the Westerbecks acquired the capital stock thereof, and they have never had an actual, bona-fide intention of exercising the business rights and privileges created by such charter;

"That the only value of that stock to the Westerbecks was its nuisance value to the American Can Company of New Jersey;

"That the alleged business activities of the corporation in December, 1925, and January, 1926, and the alleged expenditures of Mr. Frederick L. Westerbeck towards rehabilitating the corporation in business were mere pretense and self-serving in their purpose, and

that the loss sustained if the court should decree forfeiture would be only nominal;

"That the American Can Company of New Jersey conceived this proceeding for the selfish purpose that they might proceed to do business in Missouri in their own name, and brought the matter to the attention of the Attorney-General."

IV. Much is said in the argument regarding the purposes of the parties particularly interested in the outcome of this proceeding; much that is irrelevant. The fact that the American Can Company of New Jersey brought this matter to the attention of the Attorney-General and that it would be benefited by the success of the proceeding is entirely unimportant. While the offices of the State in a matter of this kind cannot be employed to adjust private difficulties, yet if the respondent has violated the law in such manner as to make itself liable to ouster, it is entirely immaterial from what source the Attorney-General received his information, or by what influence he was induced to act, provided always it was his duty to bring the proceeding.

Likewise, the fact, as found by the commissioner, that the respondent was not acting in good faith, even if the sole purpose was to drive an honest competitor out of business, would not of itself authorize a judgment of ouster. If, in fact, respondent had a legal right to do everything it did, and leave undone everything that it omitted to do, its motive for such action is entirely immaterial.

V. Even with the facts as clear as they are the application of the law is not without difficulty. The rule in general terms is clear enough, but adjudications affecting specific facts resembling the particular situation here are difficult to find. Corpus Juris, vol. 14A, page 1104, thus states the rule in relation to non-user:

"Whenever a corporation voluntarily and totally abandons the exercise of its franchises, and does or suffers to be done acts which destroy the end and objects for which it was incorporated, it is either *ipso facto* dissolved, or it has subjected itself to liability to be dissolved in judicial proceedings instituted for that purpose."

While a suspension of business is not of itself sufficient to authorize a proceeding to oust a corporation, it is said by Ruling Case Law, vol. 7, page 717:

"Still it seems to be well recognized that the condition of a purely private corporation may be such as to give rise to a cause of forfeiture,

as where it transfers all its property and wholly ceases to do business for a long continued period.''

It is said in State v. Railroad, 8 Am. St. 1. c. 185, in a footnote:

''Where a cause of forfeiture has arisen, mere subsequent good behavior by the corporation will not legally atone therefor.''

In State ex inf. Attorney-General v. Delmar Jockey Club, 200 Mo. 34, this court declared that for either misuser or non-user of a franchise granted to a corporation by the State, a proceeding to oust would lie, placing non-user and misuser upon the same grounds. In this case the evidence is conclusive of a total non-user from 1894, down to the date this suit was brought. It is not disputed that there was no functioning of the corporation at all from 1894 to 1908, fourteen years, and that from 1908 to 1925 the only corporate action taken was to make a report to the Secretary of State for the purpose of protecting the charter, always including the statement that it was not operating.

As to whether there was any attempt to function in good faith after that date up to the time of the hearing, the commissioner found against the respondent. True, respondent offered evidence tending to show that it was acting in good faith, but that evidence was contradicted by facts which came into the evidence and by the peculiar reasons advanced quoted above.

The commissioner did not believe the Westerbecks: he found that what they said was not true. In some particulars they were contradicted by witnesses for the State; for instance, as to their attempt to compel the American Can Company of New Jersey to buy out their Columbia Can Company operation, and as to other incidents regarding negotiations between Westerbecks and representatives of the American Can Company of New Jersey. They were principally contradicted by the facts which they themselves admitted, by their explanations of motives and values which could not be true. It results that the American Can Company of Missouri from 1894 up to the time of the hearing never at any time in good faith exercised the corporate powers granted to it by the State.

As to misuser, Corpus Juris, vol. 14A, pages 1107-8, lays down the rule thus:

''Misuser of its franchise or corporate powers to constitute ground for dissolution of a corporation or for forfeiture of its franchise, (1) must be misuser with respect to matter which are of the essence of the contract between the corporation and the State, (2) must be willful and repeated with knowledge of its unlawfulness, although not necessarily done with a corrupt motive, (3) and must inflict injury upon the public generally.''

Some Missouri cases are cited in the notes to that text, among them State. ex inf. v. Kirkwood Athletic Club, 121 Mo. App. 87. The third requisite that the misuser must inflict injury upon the public generally makes the point difficult of application. It is argued that that condition should apply to non-user as well as to misuser, and there seems to be no reason why it should not. In State ex inf. v. Railway Co., 176 Mo. l. c. 708, in regard to the function of *quo warranto*, quoting from a text book it was said that "*quo warranto* originated as a prerogative remedy and has always retained the character as a judicial means for the assertion of sovereign right . . . . Hence *quo warranto* will not issue merely for the determination of a private right where the whole community are not interested." That was a case of misuser. In the Delmar Jockey Club case, supra, the particular assertion of sovereignty and the right of the State is explained more definitely (200 Mo. l. c. 68); it was said:

"It is only such acts or omissions as concern matters which are of the essence of the contract between the State and the corporation, or, in other words, in which the public has an interest, that are causes of forfeiture." And further, on the same page:

"When a corporation receives from the State a charter granting certain franchises or rights, there is at least an implied or tacit agreement that it will use the franchises thus granted; that it will use no others, and that it will not misuse those granted. A failure in any substantial particular entitles the State to come in and claim her own, the rights theretofore granted, and this through a judgment of forfeiture in a proceeding like the one at bar."

That was a case of both misuser and non-user.

The cases involving non-user, where a forfeiture could occur because of failure of the corporation to keep its contract with the State, are generally cases involving a corporation engaged in some public service—railroad companies and the like.

In the Delmar Jockey Club case the non-user was failure to conduct a fair at Sedalia and give exhibitions of agricultural products and contests of speed in races between horses. It was said the public was interested in that because it would tend to encourage improvement in domestic animals and agricultural or horticultural products.

The public in the same sense is not interested in the determination of this case. The manufacture of cans is not a public service, but it is a very important industry in which people generally are interested, although it is a private business. The principle has been applied to banks. [State v. A. T. & S. F. Railway Co., supra, l. c. 185.]

Where the cause of forfeiture consists of omissions which are of the essence of the contract between the State and the corporation, the *State* may not be distinguished from the *public.* [State v. A. T. & S. F. Railway Co., supra, 1. c. 182.] In the conduct of a corporation the public, at least the State, is interested in such actions as are in restraint of trade, or incompatible with public policy. In State ex inf. v. Standard Oil Co., 218 Mo. 1. c. 350, it was said:

''The inquiry is not as to the degree of injury inflicted upon the public; it is sufficient to know that the inevitable tendency of the act is injurious to the public.''

The Standard Oil Company, in that case, was indulging in practices which tended to stifle competition; unfair trade; and that was held to be a matter in which the public generally were interested. The difference between that case and this is only in degree. That was a private business, just as the manufacture of cans is a private business. The effect of the misuser of the respondent here was to hamper competition. It held on to a corporate name, not for the purpose of operating under it, but for the purpose of preventing anybody else using it. That exclusion not only applied to the American Can Company of New Jersey, but to any persons who might choose to incorporate under that name. Of course questions of this kind usually arise where a corporation with large capital engages in unfair practices affecting corporations with smaller capital, but the principle is the same either way. If, in fact, such an injury occurs it would not matter whether it is occasioned by a smaller corporation to a larger one or a larger one to a smaller one.

VI. The respondent not only has failed to perform its contract with the State and conduct the business which it was authorized to conduct, but it has imposed upon the State by misrepresentations. The complete reports to the Secretary of State are not copied into the record, but the evidence shows that the report of July 16, 1925, was a sample of all reports for previous years. In that report it was stated that the amount of capital stock paid up was $20,000; that the actual value of the shares was one hundred dollars. Not one of those statements was true. That was a representation to the Secretary of State and to the public that this corporation had the equivalent of twenty thousand dollars in actual assets. Originally when incorporated in 1887, possibly twenty thousand dollars was paid up, but it had no assets when the reports were made. The effect of the purchase of this stock by the Westerbecks after the corporation had lain dormant for fourteen years was the same as if they had organized a new corporation at the time. Section 9809, Revised Statutes 1919, replacing the statute which had theretofore required reports of a corporation, provided that reports should be filed on or before the first day of

July with the Secretary of State, showing the amount of capital stock paid up, etc., "the *actual value* thereof per share, the cash *value of all property in this State,* the cash value of all property without the State; the total indebtedness, secured and unsecured, . . . *and the clear market value of its total capital stock and surplus, including all property and* assets."

That certainly did not get into the reports, and had not been in any report from 1919 to 1925. There was no statement of the market value of the shares or of the assets. The only statement that truthfully could have been made was that those things had no market value. Then Section 9813, Revised Statutes 1919, also enacted in 1919, provides that if any corporation shall fail to comply with the provisions of this article (Art. I, Chap. 90), on or before the first day of December, the corporate rights and privileges of such corporation shall be forfeited. The respondent failed to comply with the provisions of the article, because it reported a false statement of the value of the stock, and either no statement or a false statement of the cash value of the assets. It is true that the petition does not specifically allege a failure to comply with that particular statute, but it does allege in general terms that the respondent since the year 1891 had failed to report. That shortly after the change of the corporate name, in 1891, "the respondent ceased to do or perform any of the things or acts specified to be done in said articles of association as required of it by the laws of this State; and ceased to elect any officers or make any reports to the Secretary of this State as required by the laws of this State." That allegation would cover failure to comply with the present law, as well as with previous laws.

Therefore, respondent not only has failed to comply with the terms of the contract with the State where it undertook to engage in business, but it has persistently and continuously misrepresented its status to the Secretary of State and thereby misused and forfeited its franchise.

The judgment of ouster is therefore ordered. All concur.