THE STATE EX INF. NORTH TODD GENTRY, Attorney-General, v. LONG-BELL LUMBER COMPANY.—12 S. W. (2d) 64.

Court en Banc, December 7, 1928.

464

*North T. Gentry,* Attorney-General; *Chas. M. Mayer* and *R. R. Brewster* of counsel.

468

*Jesse Andrews, Cyrus Crane, Joseph A. Guthrie* and *George H. Combs, Jr.,* for respondent.

PER CURIAM:—This is an original proceeding in quo warranto brought by the Attorney-General, as informant, to oust respondent, a Missouri corporation, of its corporate franchise. The pith of the numerous grounds alleged is that respondent has engaged in activities beyond its corporate powers, particularly in its development of the townsite now known as the city of Longview, in the State of Washington.

Respondent's defense, elaborately pleaded in its answer and return, is that the activities and business operations complained of are well within its charter powers.

After the issues were thus joined informant filed a motion asking for the appointment of a commissioner to take evidence in the cause and report his findings to the court. This motion was sustained and Honorable FRED L. WILLIAMS, a former member of this court, was appointed as special commissioner to take testimony and report his conclusions on the facts and the law. Thereupon Judge WILLIAMS duly qualified as such, took the testimony, and on June 15, 1928, filed his report in this court embracing a very comprehensive finding of facts and statement of his conclusions of law, and recommending that all relief sought by informant be denied and that judgment be entered in favor of respondent. Informant filed no exceptions to this report, but on the seventh day of November, 1928, Honorable Stratton Shartel, Attorney-General of the State of Missouri and successor to informant herein, filed written consent that judgment be entered in this cause in conformity with said report of the special commissioner.

The testimony covers such a wide range, the exhibits are so numerous, and some of the questions of law and of fact are so complicated, unusual and far-reaching that a summarization made within the usual length of our written opinions would not render a proper understanding of the case possible. The commissioner's finding of facts and conclusions of law are so complete and apposite, and they so admirably express the opinion of the court that we adopt them, as follows:

### FINDING OF FACTS.

"The respondent was incorporated under the laws of Missouri relating to manufacturing and business corporations in 1884. Starting then with a capital of $300,000 as a retail dealer in lumber, the business prospered and expanded until in the year 1920 it had become one of the largest manufacturers of lumber under one name in the world; its lumber sales that year were: wholesale, $25,332,236.21; retail, $18,276,653.13; total, $43,608,889.34, and the sales of its mercantile stores which it operated at different plants were that year

in excess of six million dollars. Its authorized capital stock in 1922 was $30,000,000. In addition to its manufacturing operations hereinafter described, it operates 118 retail lumber yards in Missouri, Kansas, Oklahoma, Texas, New Mexico, California, Oregon and Washington, and now has about 12,000 employees. Its total resources, as shown on its books November 30, 1926, were in round numbers $104,242,000, and its total net worth was in round numbers $57,-246,000.

"The purposes expressed in respondent's original charter were:

" 'The purposes for which this association is formed are for the buying and selling of all kinds of lumber and other building material and the buying and selling of coal.'

"These purposes were in 1907 amended to read as follows:

" 'The purposes of this corporation are to manufacture, buy, sell and otherwise acquire and dispose of lumber and all kinds of building material; to mine, buy, sell and otherwise acquire and dispose of coal, wood and all kinds of fuel; to buy, sell, lease and otherwise acquire and deal with and in real estate, timber lands, coal lands, mills and machinery, of every kind and character, necessary and incident to the carrying out of the purposes of this corporation; to build, construct, buy, sell, lease and otherwise acquire railroads and tram roads of all kinds, necessary or incident to the purposes of this corporation, and to buy or otherwise acquire all other means of conveying or distributing any of the aforesaid materials, which may be necessary or incident to the purposes of this corporation. To obtain, acquire or control railroads and other means of conveyance and all necessary timber, lands, coal lands and supplies of lumber, coal and fuels of all kinds, and all leases, property rights and interests sufficient to carry out the purposes herein recited, and to this end and for this purpose to acquire, own or control certificates of stock and other securities in lumber companies, timber companies, coal companies and similar companies or corporations, foreign or domestic, engaged in the business of manufacturing, buying, selling and otherwise dealing with and in lumber and all kinds of building material, coal and all kinds of fuel, and in the transportation thereof, and to sell, assign, transfer, convey, pledge, mortgage or otherwise dispose of such land, mills, machinery, leases, certificates of stock, bonds, property rights and interests, and generally to do all things necessary or proper which may be incident to any of the purposes herein recited or in any way connected therewith and generally to purchase, hold, mortgage or otherwise convey such real and personal property as the purposes of the corporation shall require, and to have and to exercise all the franchises, powers, rights, privileges and immunities conferred by law upon corporations created and organized for the purposes aforesaid.'

"Later, and on July 10, 1922, the purpose clause of its charter was amended to read as follows:

" 'The purposes for which this association is formed are as follows: 1. To purchase, lease or otherwise acquire, and to hold, use, operate and develop, or to sell or otherwise dispose of, timber and cut-over lands, including the minerals in such lands. 2. To erect, purchase or otherwise acquire, own and operate, or sell or otherwise dispose of sawmills, sash, door and blind fact·ries, box factories, woodworking plants, turpentine refineries or other wood-product manufacturing plants, or plants for the further treatment of by-products of wood-product plants; and in connection with said saw-mills, factories or other plants to conduct merchandise stores, buying and selling the goods, wares and merchandise for said stores either at wholesale or retail. 3. To manufacture, purchase or otherwise acquire, and to sell or otherwise· dispose of, lumber, lath, logs or shingles, sash, doors or blinds, or other wood products or by-products of any of said manufacturing operations, and to purchase, sell and otherwise deal in building material of every kind and description, selling at either wholesale or retail. 4. To purchase, construct or otherwise acquire, and to operate ships, boats, ferries, docks, engines, cars, tram roads, railroads or other means for transporting lumber, lath, logs or shingles or other wood products or the by-products of any of said manufacturing operations, or for transporting other freight or transporting passengers, except that the company will not maintain or operate any railroad in the State of Missouri. 5. To purchase, develop and handle town-sites in connection with or tributary to lumber manufacturing plants, and to purchase, construct or otherwise acquire, and to operate street cars, bus lines, water works, gas plants and electric plants for the convenience of the inhabitants thereof and the profit of the company, except that the company shall not maintain or operate any street railroad in the State of Missouri. 6. To purchase or otherwise acquire and to hold and own, or to sell, assign, transfer, mortgage, pledge or otherwise dispose of, stocks, bonds or other obligations of any corporation formed for, or then or thereafter engaged in, or purchasing any one or more of the businesses above mentioned, or owning or holding any property which the company might lawfully own or hold. 7. To mine, purchase or otherwise acquire, and to sell and deal in coal, selling at either wholesale or retail. 8. The company may conduct its business in other states, in the territories and colonial possessions of the United States and in foreign countries. 9. Without in anywise limiting the foregoing purposes, it is hereby declared and provided that the company shall have power to do any and all acts and things that may be reasonably necessary

or appropriate to accomplish the purposes, or any of them, for which the company is created.'

"For the past twenty years or more it has been the settled practice in the office of Secretary of State of Missouri to issue charters to manufacturing and business concerns when their corporate purposes, as disclosed by the articles of association or agreement (and not expressly prohibited by the statute), were taken indiscriminately from one or two or more of the eleven subdivisions of the governing statute (now Sec. 10151, R. S. 1919), and the same settled practice has prevailed in allowing amendments to existing corporate charters of manufacturing and business corporations under the related statutes (now Secs. 10159 and 10161, R. S. 1919).

"Prior to 1922 respondent's lumber manufacturing operations (which were operated largely through subsidiaries) were all in the South, except its operations at Weed, California. It owned and controlled large acreage of timber land in the South and there, at various locations, operated ten or more large sawmills. It also operated a large sawmill and manufacturing plant at Weed, California, near which it owned large timber tracts.

"In the South, in connection with its lumber operations, it owned and operated, through subsidiaries, five railroads incorporated as common carriers. In connection with the inauguration of its respective lumber manufacturing operations in the past, and especially at locations remote from cities or towns, respondent had, from necessity, been compelled to build and maintain residences, boarding houses, hotels, general stores, electric light distributing plants, water works systems, sewers and streets for the use and convenience of its employees. At some of its places, where the following facilities did not exist, it also built and maintained church buildings, schools, recreation centers and moving-picture houses, which experience had convinced its officials were necessary and essential to the maintenance of the proper morale of its employees.

"The timber supply available for these operations in the South was not such as to insure permanency of operation, and these towns and facilities for the employees were built up and maintained without any preconceived plan as to permanency. By reason of this, outside capital did not seek investment in these facilities and the respondent was unable to liquidate its holdings therein, but was compelled to carry the investments.

"Investments in these facilities in the South, built at a time when costs were about one-half present costs, amounted to approximately $2,000,000, not including the land, street improvements, sidewalks, electric light or water works system. The investment carried in tenements and buildings at Weed, California, amounted to $902,451.-90, which did not include the cost of streets, sidewalks, lands, sewers,

electric light and water system, and were built when costs were much lower than at present.

"In 1922 all of respondent's subsidiary companies, except the railroad companies, were dissolved, and thereafter those manufacturing and business operations formerly conducted through subsidiaries were continued directly by respondent.

"In the year 1918 it became apparent to the directors of the respondent that in a few years its standing timber in the South would be exhausted. The problem presented was whether the company should prepare to liquidate its holdings and eventually go out of the business of manufacturing lumber, or should purchase additional standing timber and prepare for future manufacturing operations. At that time Mr. R. A. Long, then sixty-eight years of age, one of the founders of the company and then owner of seventy per cent of its capital stock, suggested that this problem should be decided by the vote of his associates. All but three of these associates (some fifteen or twenty in number) were men who had grown up with the business from inferior positions to the many important positions of trust and responsibility in the company. They were originally employees of the company who had been permitted from time to time to purchase stock therein and who, through their experience and ability, had risen to responsible positions in the organization. Included in this number was Mr. F. J. Bannister. A meeting was held and by unanimous vote, including the vote of Mr. Long, it was decided to purchase more standing timber and prepare for the future manufacturing operations of the company.

"Expert timber cruisers were employed and after much investigation the company decided to, and did, in the year 1920, purchase for the sum of approximately $14,000,000 a large tract of standing timber (Douglas fir) in the State of Washington, located some thirty miles or more north of the confluence of the Cowlitz and Columbia Rivers. Later additional tracts of standing timber in that part of the state were purchased, making the total acreage approximately 90,000 and the total investment in standing timber in that state approximately $17,000,000.

"The timber purchased in the State of Washington averages 90,000 feet per acre, which is about ten times as dense as the timber owned by respondents in the South. Its timber near Weed, California, averages from 13,000 to 14,000 feet of timber per acre.

"The next problem confronting respondent was the selection of a suitable site in the Northwest for the location of its sawmills and a site for a town sufficient in size to house its employees, if the mills should be located at places where housing and living facilities for its employees did not exist.

"The timber so purchased in the Northwest,. together with other timber tributary to this territory and available for purchase by respondent, was sufficient in quantity to justify the belief then held by respondent's officers that the two large sawmills which the company planned to build in the Northwest could be kept in operation twenty years or more, and that thereafter, by reason of the growth of other standing timber (now too small to cut), and later by means of reforestation methods then in contemplation (and now being actually applied), a continuing supply of standing timber would be available to these manufacturing operations for generations to come.

"In 1920 respondent sent its chief engineer and two other employees to investigate and report on the best location for a sawmill on the Columbia River between Portland, Oregon, and the ocean. After walking down on one side of the Columbia River and back on the other, from Portland to the ocean, and making inspection trips into the country adjacent or tributary to its timber tract, the chief engineer reported several locations, but recommended the site at the mouth of the Cowlitz River as the best. (This site is now known as Longview). This site was finally approved by respondent after several days spent in conference by respondent's officers, at which the several sites reported to it were considered.

"This was the logical site. It was the nearest one to the ocean that also had available railroad connection, and was in front of the deepest water on the Columbia River, the river there being sixty feet deep at low-water stage. Ocean-going vessels are able to turn on their own power in front of this mill site, at which point a dock sufficient in size to accommodate six vessels at one time has been constructed by the respondent. Approximately fifty per cent of respondent's manufactured products are shipped by water.

"Another advantage of the Longview site over either Portland or Astoria was the saving of the additional expense which would have been incurred in rafting the logs from the mouth of the Cowlitz River up the Columbia River to Portland or down the river to Astoria. It was estimated that this would cost between one dollar and $1.25 per thousand feet, or approximately $10,000,000 during the life of respondent's plant.

"After selecting this site options on 2000 acres of land at this site were first taken in 1920, and in the spring of 1921 this land, together with additional land, totaling 3200 acres, was purchased.

"At the time the first 3200-acre site was purchased little detailed study or consideration had been given by respondent's directors to the availability of the site as a location for a town, further than that respondent's officers knew there was plenty of room in or adjoining the Longview site upon which to build a town for its employees. The

principal consideration up to that time had been given to the sawmill locations.

"It was then in contemplation to build one large mill at Longview, and another large mill at Astoria, at the mouth of the Columbia, and approximately fifty-two miles downstream from Longview, but for good and sufficient economic reasons it was later, in January, 1922, decided to build both mills at Longview. These two mills have since been built on this site, one being the largest sawmill in existence, with a daily capacity of 1.000.000 feet of lumber, and the other with a daily capacity of 750,000 feet. As much as 2.200,000 feet per day for a period of thirty days have been cut at the two mills. The capacity of these two mills equals that of the ten mills in the South. Two million feet of lumber is equivalent to fifty carloads. Over seventy-five acres are under roof in the two mills. Both are electrically driven, each machine therein having a separate motor. On account of the size of the logs to be sawed here, some of the machinery is ten times the strength of similar machinery used in the South.

"Labor is higher in the Northwest than in the South. Respondent has a large export business to Japan, China and Australia, where they come in competition with Siberian and North China labor, which receives about one-twentieth the wage paid by respondent. In order to meet this competition the latest improved labor-saving machinery was installed, and in deciding upon the machinery to be installed the test employed was whether the proposed machinery would in two and one-half years produce a saving, over the old method of operation, sufficient to pay for the machinery. By this method, in many departments of the manufacturing operation, one man is now enabled to handle as much lumber or timber as twenty men had theretofore handled. The operation of such machinery requires generally a higher class or skill of labor than used in respondent's mills in the South. Three thousand men are now employed in the lumber-manufacturing operations at Longview, and 1000 men are employed in the logging operations at Ryderwood. Ryderwood is about thirty miles north of Longview and is a town built by respondent for its employees engaged in the timber operations in the woods, and none but employees live there.

"The electric power and light used by the two sawmills and the operations and inhabitants at Ryderwood and the inhabitants of Longview is generated by a large power plant built by respondent on the millsite at Longview. It cost about $3,200,000. About one-third of the log is waste and cannot be manufactured into lumber. Aside from a small portion of this waste which is sold for wood, the remainder is ground up by heavy machinery and is then called 'hog fuel.' This 'hog fuel,' which is fed automatically into the furnaces of the power

plant, supplies the fuel used in the process of generating electricity, and in that manner what was formerly a waste product (or nearly so) is now converted into electric current. All of the 'hog fuel' is not at present consumed by the power plant demands, and some of it is sold to others. The power plant is so planned that, as demand for electric current increases, additional furnaces can be added to the plant and the production of electric current increased.

"The total investment in the two sawmills at Longview, including the power plant and facilities used directly in the manufacture of lumber, is in excess of $19,000,000.

"In 1924 respondent, through a subsidiary, caused to be incorporated under the laws of Washington a subsidiary corporation known as The Longview Stevedoring Company with an authorized capital stock of $10,000. The total resources of this company as of April 30, 1927, were $22,931.53, after depreciation. The principal business of this company is the loading of vessels. Ninety-five per cent of its business consists of loading vessels for respondent at its own docks at Longview. The stevedores are unionized, and for this reason, and possibly others, the subsidiary was organized to handle this specific work for respondent.

"It became necessary for respondent to find some means for transporting its logs from its timber tract at Ryderwood to its mills at Longview. It first attempted to get the three railroad companies, then operating over the same tracks from Portland to Seattle, to haul the logs; this joint track ran along the east bank of the Cowlitz River opposite Longview, but these companies, because of a tunnel and traffic conditions on their road, thought the undertaking too hazardous, and refused. These companies also refused to build a railroad for this specific purpose and, being unable to procure this means of transportation by others, the respondent was compelled to and did build its own railroad from Longview to Ryderwood. It was necessary to condemn some of the right of way, and, since under the law this could not be done except by a common carrier railroad, the railroad was incorporated under the laws of the State of Washington under the name of Longview, Portland & Northern Railway Company. This railroad corporation spent about $4,450,000 in constructing the road. This money was advanced by respondent, which received in payment therefor all the capital stock of the railroad company, of the par value of $1,250.000, and bonds, of the par value of $3,200,000. The total investment in this railroad company as of November 30, 1926, was approximately $5,400,000.

"On account of the amount of timber supply and the soil and climatic conditions the construction employed was necessarily of a permanent and substantial kind, suitably adapted to the daily pas-

sage of heavy log trains in all kinds of weather. Over 1,000,000 feet of logs are now daily being hauled over this road to respondent's mills; this consists of two trains, each carrying over 500,000 feet of logs, and each train being approximately one mile in length.

"A railway station was built on this line at Longview, costing about $120,000, after the railroad company had procured an agreement from the three railroads jointly operating the trunk line from Portland to Seattle (which line skirts the eastern bank of the Cowlitz opposite Longview) that they would shunt or operate at least two passenger trains each way daily through the Longview station instead of through the Kelso station. These three trunk-line roads also agreed to pay from seventy-five per cent to ninety per cent of the expense of operating the station and six per cent interest on half of the cost of building the station. Afterwards, when the matter was presented to the Interstate Commerce Commission, the Commission refused to give its consent, and up to the present the three railroads have not operated any of their trains through the Longview station. Further efforts are to be made to have the Interstate Commerce Commission reconsider its ruling. (Since the closing of the testimony in this case and the writing of the above the Interstate Commerce Commission has reconsidered the above matter and reversed its prior ruling thereon and did on March 31. 1928. issue a formal order of public convenience and necessity granting the right to the three trunk-line railroads to operate a specified number of their trains through the Longview depot. This information has been supplied by counsel for respondent filing a copy of said order with the Special Commissioner herein; it was then asserted by counsel for respondent that they hoped to file a formal stipulation making the copy of said order a part of the record herein. No formal stipulation to that effect has been so filed, but one of the counsel representing informant has written a letter to the Special Commissioner stating that they were perfectly willing to enter into such a stipulation. I have placed the copy of said order and the letters of the respective counsel concerning the same with the original exhibits which I have forwarded to the clerk of this court.)

"Aside from the transportation of respondent's logs and respondent's employees and some of respondent's manufactured products, the outside business which this railroad does is negligible. I find that this railroad was constructed by respondent in supplying a necessary means of transporting its logs and that it has had no intention of having the railroad engage in activities other than those mentioned above. I further find that it is the intention and desire of respondent to sell its investment in this railroad company if it can find a satisfactory purchaser.

"At Ryderwood (the logging camp) respondent owns eleven locomotives and some two hundred and eighty logging cars. Branching out from Ryderwood into the timber, much of which stands on very hilly and uneven land, are some fifty odd miles of lateral railroad spurs costing from $12,000 to $45,000 per mile, over which the logs are collected and brought down from the timber to the northern terminus of this railroad.

"Respondent's tree nursery for its reforestation service is also located at Ryderwood.

"Early in January, 1922, respondent first took up in detail the question of the development of its Longview site. Work had already progressed in clearing the heavy timber and under-brush which covered the mill site.

"The company estimated that it would eventually have approximately 4000 men employed in the Longview mills; reliable expert opinion dictated that this number should be multiplied by three and one-half to ascertain the total number of people included in employees' families, making a total of 14,000, and that to ascertain a proper estimate of the total population of such a community fifty per cent should be added for tradespeople and professional people and others and their respective families expected to come into such a community to serve the inhabitants thereof. It was then in good faith believed by the officers of the respondent that the enterprise which they were about to locate at this place would ultimately produce a settlement of from 20,000 to 25,000 inhabitants.

"At that time the town of Kelso, about four miles distant from the mill location and on the opposite side of the Cowlitz River (except about 300 inhabitants on the west side of the Cowlitz, known as West Kelso), had a population of about 2300. On account of its unsanitary conditions, its lack of proper sewer facilities, the surrounding topography of the land and the fact that it was at that time the 'stamping ground' of an organization known as the I. W. W.'s, it was not a desirable place to house or locate respondent's employees and their families. The town of Ranier, Oregon, with a population of about 900 inhabitants, was the only other near-by settlement, but it was across the Columbia River from the mill site and there was no bridge across the Columbia at or near that point.

"The only available place left upon which to house its employees was on land lying in the same valley and adjacent to the mill location. The millsite occupied the southeastern portion of a valley containing approximately 14,000 acres. This valley is bounded on the east by the Cowlitz River, on the south and southwest by the Columbia River, and on the north and northwest by the hills. It is about three and one-half miles wide at the eastern end and narrows down

to a little over one mile in width at the western end. The valley extends from the Cowlitz River in a northwesternly direction a distance of approximately seven miles. With the exception of a hill about one and one-half miles long and one-half mile wide, known as Mt. Solo, and a small hill known as Mt. Coffin, the entire valley is low land and most of it was at that time subject to overflow from the occasional floods coming down the two rivers and the small streams leading down from the hills on the north.

"In order to protect the mill properties, the employees, and homes to be built for employees, it was necessary that permanent dikes be erected to keep out the waters from the rivers, and to dig a drainage ditch along the lower edge of the hills to carry off the water coming into the valley from the small creeks, and also to construct a system of drainage ditches throughout the valley.

"When the diking and drainage problems began to be studied in detail it was found that it would be necessary to acquire additional land in the valley. Options on 6336 additional acres were acquired, making a total of about 9500 acres, slightly more than two-thirds of the valley. It was then planned to dike the property by diking along the Cowlitz River and down along the Columbia River to a point approximately two-thirds of the way down the valley and then extend the dike at right angles across the valley to the hills; the valley was approximately three miles wide at this point.

"The natural drainage of this valley was toward its western or northwestern end. The cross-diking of this valley as at first contemplated would materially interfere with the drainage thereof and would require all waters accumulating therein by seepage or otherwise to be pumped to a height of four feet above what would be required if the whole valley were included in the plan and the pumping plant located at the western or northwestern end thereof. The cost of diking the entire valley by means of suction dredges operating from the rivers was no greater than the cost of diking two-thirds of the valley. part of which would have had to be done by dry-land operations. From a practical and economic engineering standpoint the proper diking and drainage of the land required by respondent for its mill site and town site in said valley made it necessary to adopt a plan which included the diking and drainage of the entire valley. In order to properly execute this plan it was necessary and essential that the respondent own the land involved during the execution of the work.

"The officers of respondent, at first reluctant to come to this conclusion, were, in July, 1922, finally convinced by its chief engineer that such a plan was necessary, and following that decision, some time after July 10. 1922, all the remaining land in the western end

of the valley was purchased by respondent. This made respondent's total acreage in the valley approximately 14,000. The total purchase price of this land was $2,611,103.22.

"After respondent purchased the remaining portion of the western end of the valley it began the work of building a dike around the lower sides of the entire valley; this dike, when completed, extended from the hills on the west bank of the Cowlitz River down along this west bank to the mouth of the Cowlitz, thence down the north bank of the Columbia to the western end of the valley and thence across the western end of the valley to the hills on the north. This dike, approximately twelve miles in length and about four feet higher than high water mark, was built out of sand and dirt drawn from the rivers by suction dredges. The work had to be done rapidly and under pressure of time between high water seasons, one occurring in December and January of each year and the other in May or June. Respondent leased all the suction dredges it could find available for leasing, but was compelled to buy additional dredges with which to speedily complete the work.

"After this work was under way respondent, for the purpose of facilitating the financing of the project, caused the entire valley to be organized into a diking or drainage district under the laws of the State of Washington. This drainage district then condemned the right of way for the dikes and drainage canals and made a contract with respondent to complete the job on a cost-plus basis. The total cost was about $3,250,000, for which amount the district duly executed its bonds, payable in fifteen annual installments. There being no other bidders the respondent company purchased these bonds, paying therefor with district warrants theretofore issued to it by the district in payment of the work as it progressed. Respondent then guaranteed the payment of the bonds by appropriate indorsement thereon and sold the same, thereby reimbursing itself for the expenditures made or incurred by it in doing the diking and drainage improvement work. The value of the land in this district (some of which has now been sold to outside interests) is such that the liklihood of respondent being called upon to pay the bonds under its guaranty is very remote. However, the company was not able to sell the bonds at this early stage of development without this guaranty.

"After this improvement work was completed, and respondent no longer had need for all the dredges, it attempted to sell the same. It has sold two or three, but still has three or four dredges that it has been unable to sell. Dredges, depreciate in value more when lying idle than when being used. In order to preserve the dredges and at the same time do the thing most likely to result in a sale of the dredges, respondent organized a subsidiary corporation known

as Longview Dredging & Construction Company, which took over the remaining dredges and issued its entire capital stock, $450,000 par value, to respondent in payment therefor. The dredging company thereafter moved two of these dredges down onto the Sacramento River in California where it is now engaged in doing dredging work under a Government contract, with the right reserved to make sale of these dredges at any time on twenty days' notice. Since the completion of its diking and drainage work at Longview it has been, and still is, respondent's intention to sell these dredges as soon as a suitable purchaser can be found. The total resources of this company April 30, 1927, were $787,356.78.

"In 1922 respondent secured the services of Mr. J. C. Nichols of Kansas City, Mr. Herbert Hare of Kansas City, Mr. B. L. Lambuth of Seattle and Mr. George Kessler (now deceased), men experienced and specializing in the work of city building and planning, to advise respondent concerning the plan to be adopted in developing the townsite of Longview to accommodate a population of from 15,000 to 25,000. These men gave much time and careful study to the matter. Two of them made inspection trips to eight or ten cities, ranging a population from 20,000 to 25,000, to study more in detail the problems of city planning or building. All of the above men made trips to Longview to view the land and study the problem.

"In planning the city of Longview it was uppermost in the mind of respondent's directors to build a permanent city of such kind as would attract a high class of employees and their families and sufficiently attractive to help induce employees to own their own homes and cause outside capital to seek investment in the facilities necessary to serve the population, and thereby ultimately relieve it from the necessity of carrying investment in such matters as it had been compelled to do at its more or less temporary locations elsewhere. Many of respondent's competitors in the Northwest operated sawmills at or near such cities as Portland, Seattle and Bellingham, where modern living facilities were available to this class of laborers, and in order that respondent might attract its requirement of the higher class of laborers it was necessary that attractive modern living facilities and surroundings be made available to them at or near the site of its operation at Longview. In the South this had not been so necessary, because many of respondent's competitors in the South operated as it did, in more or less temporary, inferior or haphazard towns. In taking over this large tract of land in the valley respondent also had in mind the desire to control the ultimate use and development of the land in the valley, so that it might be in a position to prevent the springing up of a near-by community of dives, gambling houses, blind tigers, red light districts and other undesirable elements tending to injure and tear down the morale of its

employees, as had been the situation at its town of Weed, California. Weed was not carefully planned in this respect. When the townsite of Weed was originally laid out, adjoining land available for town building was not purchased by the lumber company. On this adjoining land and immediately adjoining the residential section of Weed an undesirable community or town, containing many, if not all, the above undesirable elements, sprang up and has been and remains a constant source of trouble and annoyance to respondent and its employees.

"It has at all times been respondent's intentions to sell as soon as it could conveniently do so, after the drainage and diking project was completed and the townsite was properly laid out and developed for sale, all the land in the valley not then needed or required for its immediate lumber manufacturing and selling operations.

"In December, 1922, the above-named city-plan experts made a report and recommendation to a meeting at Kansas City composed of practically all of respondent's officers and directors. This meeting continued for ten days, during which time a careful detailed study was made of the problems presented in the adoption of a plan for the proposed city of Longview. Two types of city planning were considered. One plan, known as the 'snowball type,' allows the city to grow by accretions on the outer edges. Another type which may be referred to as the 'zoned type' divides the townsite into districts or zones with restrictions limiting each zone to specific use or uses. In laying out a plan for a new city the 'zoned type' usually involves more land than does the 'snowball type.'

"Respondent adopted the 'zoned type' plan. It was estimated that 6000 acres would be required for a city of this type in accommodating a population of from 20,000 to 25,000. The townsite was divided into seven or eight zones. A civic center was platted near the center of the townsite with five or six thoroughfares or streets centering there. To the east and south of this civic center, retail, commercial and wholesale districts or zones were laid out. To the west of a line running slightly northeast and southwest through the civic center were located several different residence districts or zones, in which the minimum residential cost restrictions varied from $300 up to as high as $7500. And to the west of the residential districts proper acreage tracts, varying from one-half acre to four or more acres, were provided for suburban residents and gardening. As the development work progressed the land in the various zones was platted as needed. Main streets or thoroughfares were platted and improved, connecting all the different zones, from which lateral streets were extended more in detail into the zones as the development of the respective zones progressed.

"In the fall of 1922 construction work became very active. Most of the supplies and materials had to come from Portland, approximately fifty miles distant. A paved road connected Ranier with Portland along the south bank of the Columbia, but there was no paved road on the north side of the river. In order to facilitate the bringing of supplies to Longview from Portland over this paved highway it was necessary for respondent to equip and establish a ferry service across the Columbia River from Longview to Ranier. In order that respondent's loss from any liability incurred in operating this ferry might be limited to the property or capital used in its operation, a subsidiary corporation, known as the Longview Ferry Company, was organized under the law of Washington, which took over the ferry and has since operated the same. The stock in this company is owned by The Longview Company, a subsidiary of respondent.

"During the progress of the development of this townsite and valley, largely for bookkeeping and other justifiable reasons, later to be mentioned, the respondent organized and financed, in whole or in part, either directly or through subsidiaries, the following subsidiary corporations under the laws of the State of Washington, through which it carried on this development work, to-wit:

"The Longview Company, The Longview Suburban Company, The Longview Public Service Company, Longview Loan & Investment Company, Longview Concrete Pipe Company.

"The Longview Company, with an authorized capital stock of $7,500,000 ($1,000,000 of which was originally issued), was incorporated in 1923 for the principal purpose, stated generally, of taking over and developing and selling that portion of the valley known as the Longview townsite, consisting of approximately the eastern half of the valley, exclusive of the millsite and a small tract known as West Kelso. The total resources of this company as of April, 1927, were $6,856,295.92.

"The Longview Suburban Company, with an authorized capital stock of $1,000,000, was incorporated in 1923 for the general purpose of taking over and developing and selling the western half of said valley. Instead of having this land placed under the lien of respondent's general mortgage, the land was conveyed to this subsidiary corporation, and the stock of this corporation included under the mortgage. This was done to make more convenient the transfer of this land from time to time as sales are made. Total resources of this company as of April 30, 1927, were $2,986,640.33.

"The Longview Public Service Company, with an authorized capital stock of $2,500,000 ($400,000 of which was originally issued and paid up by the Longview Company), was incorporated in 1923

to take over, construct and operate the waterworks, electric-light distributing system and the busses serving the inhabitants of Longview. The operation of companies distributing water and electric current in the State of Washington are subject to state regulation and supervision. To simplify the making of reports, bookkeeping, etc., it was more convenient that these utilities be operated by a separate corporation, and for this reason this subsidiary was formed. Total resources of this company on April 30, 1927 (after sale of its electric light and water system), were $120,118.91.

"The Longview Loan & Investment Company was incorporated in 1923, with a capital stock of $100,000, for the purpose primarily of providing financial assistance for those desiring to build homes or buildings in Longview. Respondent, through the Longview Company, took $60,500 par value of this stock. The remaining capital was taken by others. To the extent that respondent's employees, or others, use this company in financing the building of residences for the use of employees, the respondent is relieved from the necessity of investing in houses for its employees, and for that reason the respondent aided in establishing the loan company. The loan business is not limited to employees. Others may also apply and procure loans. Total resources of this company April 30, 1927, were $228,748.24.

"The Longview Concrete Pipe Company, with an authorized capital stock of $50,000, was incorporated in 1922 for the purpose of manufacturing concrete sewer pipes and buying and selling building material. Respondent's subsidiary, The Longview Company, subscribed and paid for fifty-one per cent of the stock in this company and now owns five-sixths of the stock. This company was organized for the purpose of manufacturing sewer pipes and bricks required by respondent and its subsidiaries for construction work at Longview. In this manner it procured its sewer pipe cheaper than if it had bought the sewer pipe in the open market. Its business has consisted chiefly in supplying those materials for Longview, although some outside business has been done when the products were not required for local use. Total resources of this company April 30, 1927, were $186,041.37.

"The net investment of respondent in these subsidiaries as of April 30, 1927, with depreciation deducted, was:

"The Longview Company ........................$5,024,806.56
The Longview Suburban Company .............. 2,601,887.25
The Longview Ferry Company ................. 66,524.79
The Longview Public Service Company .......... 54,647.42
making a total of $7,747,866.02.

"In 1924 or 1925 respondent, either directly or through a subsidiary, became the owner of $5000 of the $10,000 capital stock of the Taylor Insurance Agency, but sold the same early in 1927.

"Respondent company also owns $75,000 of the preferred stock in The Longview Fiber Company, a corporation located near the Longview mill site and organized by outside capital to manufacture pulp and paper out of certain waste products from the sawmills. As part payment for the one hundred acres of land sold by respondent to The Longview Fiber Company for its manufacturing site, respondent received the above amount of preferred stock. The Fiber Company is a large concern, with an authorized capital stock of $3,000,000. The preferred stock was issued at par. This Fiber Company will purchase electric power and waste material from respondent and this will mean a profit to respondent of at least $150,000 per year, from what would otherwise have been a waste product.

"In 1923 respondent assisted in organizing a bank (for the purpose of protecting its pay-rolls and receiving employees' deposits), taking eighty per cent of the capital stock. In 1925 respondent sold its interest in the bank and one-half interest in the bank building, and gave an option for the sale of remaining one-half interest in the bank building.

"In 1923 respondent established a newspaper, known as the Longview Daily News, with Associated Press service, the primary purpose of which was to promote the development of Longview. Respondent sold this newspaper in 1925 to outside capital, which now owns and publishes the paper.

"Respondent, acting either directly or through its appropriate subsidiary, has, in addition to the matters hereinbefore mentioned, done the following things in the development of the Longview townsite, to-wit:

"Built a hotel, paved a number of streets and sidewalks, built sewers, constructed a waterworks and an electric-light distribution system, started a line of busses, built homes for some of its married employees and dormitories for its unmarried employees, built a general office building and other commercial buildings and a garage, built a school building and a community house, and carried on a national advertising campaign to aid respondent in its plan and intention of selling all land and facilities owned by it at Longview and not directly connected with its lumber manufacturing operations. These various items of development will now be described more in detail.

"The hotel, known as the Monticello Hotel, was the first building of importance to be built on the townsite at Longview. It is a modern six-story, two-hundred-room hotel. Its construction was begun October 20, 1922, and completed July 12, 1923, at a cost of

about $550,000, and furnished at a cost of about $182,000. This hotel is an essential aid to respondent in supplying modern hotel facilities from time to time to some of respondent's officers and employees, and to its customers coming from all parts of the United States and from foreign countries to inspect this large lumber manufacturing operation and to make purchase of respondent's products, and also in accommodating prospective investors visiting Longview. It is customary for lumber companies to own and operate hotels near their manufacturing operations remote from such facilities. This has been respondent's practice in the South, and also at Weed, California, where it owns and operates three small hotels.

"On account of the condition of the soil and the long rainy season at Longview, beginning each year in September and continuing until about June, streets and sidewalks during such rainy seasons are almost impassable, except to caterpillar tractors and to pedestrians wearing hip boots, unless the streets or sidewalks are hard surfaced. After experimenting with gravel, it was found that in the long run it would be much cheaper if the streets and sidewalks were concreted.

"At first and before the city of Longview became incorporated, respondent concreted certain streets and sidewalks. After the city was incorporated (which occurred in February, 1924) respondent, in order to avoid carrying the investment in necessary streets and sidewalks improvements, caused improvement districts to be organized under the Washington law.

"In order to have the work done as cheaply as possible respondent agreed in advance with contractors to buy all bonds issued by these districts for such paving. After thus purchasing the bonds respondent, in order to liquidate its investment therein, guaranteed the same and sold them. The total cost of paving streets, walks and curbs was $664,000. In addition to this $565,800 was spent in grading the streets and in graveling some of them.

"Sanitary and storm sewers were built at a cost of approximately $900,000. Later these sewers were sold to the city of Longview, respondent taking in payment therefor bonds of the city of Longview. Respondent guaranteed these bonds and sold them at a profit, thereby liquidating its investment in sewers. These sewers were built in conformity with a plan or design of skillful engineers who carefully studied the ground. Sewers were necessary both as a matter of complying with the laws of the State of Washington, and as a proper and necessary safeguard to the health of the inhabitants of the townsite. The sewers when first built were larger than immediate demands required, because the townsite was then merely in process of development. They were, however, designed of proper size to drain the territory embraced and handle the load which completed develop-

ment would impose. The heavy item of sewer cost in this locality and soil is the digging of the trench rather than the size of the pipe. These sewers were laid in the streets before the streets were paved, and it was the plan of the engineers that pipe be laid of sufficient size to avoid the necessity and expense later of digging up the pavement to insert larger sewers. The size of the sewers was consistent with the contemplated townsite development, and the plan or design used was sound both from an economic and engineering standpoint.

"It was necessary .that the inhabitants of Longview be supplied with water and electric lights. Respondent, through its subsidiary, the Longview Public Service Company, constructed a waterworks system and also an electric-light distributing system at a total cost of approximately $1,100,000. At the time these facilities were first built it would have been impossible to have interested responsible outside capital therein. Later in December, 1926, after some two and one-half years of negotiation and after the townsite development had sufficiently progressed, respondent concluded a contract for the sale of these facilities to outside investors for the sum of $2,100,000, which was paid respondent on January 31, 1927. Respondent's profit from this sale was approximately one million dollars. The electric light distributing system procures its electricity from respondent's surplus electricity generated at respondent's power plant near the mills. As above stated, what was formerly considered a waste product in lumber manufacturing is used as the fuel in generating this electric current. By reason of the development at Longview having been made sufficiently attractive to cause outside capital to purchase the electric-light distribution system, respondent has been able to avoid carrying an investment in these facilities, as it had been compelled to do at other places. At the same time respondent has acquired a constant and profitable customer accepting delivery of this surplus electric current in bulk.

"Respondent, through the Longview Public Service Company, also purchased and now operates a line of busses at Longview. This is the only means of public transportation in the city, and is a necessary facility for the use and convenience of the inhabitants and the development of the townsite.

"At the time of the hearing in this case about 2200 permanent residences had been completed at Longview.

"Respondent built about 700 of these and rents them to its employees. About 700 residences have been built by people who own them, and an additional 700 have been built by outside capital. Respondent's total investment in dwelling houses of all kinds at Longview, including apartment houses, was, on April 30, 1927, approximately $880,000. If the plan of development of Longview had been such that employees and outsiders were not attracted or per-

mitted to make investment in houses there, respondent would have been compelled to build a total of from 1500 to 2000 houses, and to carry an additional investment on that account of more than $1,500,-000.

"Respondent is selling houses to its employees from time to time, and it is reasonable to predict that its investment in houses will decrease each year.

"Dormitories were built at a cost of approximately $186,000 and furnished or equipped at a cost of approximately $55,000. These are used also exclusively by respondent's employees. In these dormitories many of the unmarried employees live. Sometimes employees with families live in these dormitories until they can either buy or rent elsewhere.

"Respondent built a general office building for its own use, costing approximately $225,000, and four other commercial buildings, one a two-story building, costing about $81,000, another about $58,999.99, and two one-story buildings costing about $12,000 each, to provide rental space for merchants or professional people desiring to establish offices or places of business. Other buildings were later erected by outside capital. Respondent also built a garage costing about $23,000, to take care of its own automobiles, trucks, etc.

"Respondent built the first permanent school building at a cost of about $202,000. In order that respondent might attract desirable employees it was necessary that proper school facilities be provided for their children. In the early stages of this development it was necessary that respondent build the schoolhouse because no one else would. At that time the school district was not financially able so to do. Later this school building was leased to the school district at a rental equal to six per cent on the investment, and it is contemplated that the school district will purchase the same as soon as its finances are ample. Other school buildings have since been built by the school district.

"Respondent also built and equipped a community house, costing about $160,000, and gave the building to the Y. M. C. A., which now has about 1200 members. Respondent pays about one-half the cost of operating the same. The other half is paid from membership dues. The general secretary in charge is a man experienced in doing welfare work in industrial centers, interpreting the employer to employees and *vice versa,* and acting 'as a sort of intermediary influence between the two.' Such work is essential and necessary to the successful conduct of large industrial operations, and is now the custom and practice of many large industrial concerns in the United States.

"A hospital costing $200,000 has been built at Longview. The money was raised by private subscription. Respondent contributed

$15,000 of this amount. Respondent's injured and sick employees as well as other inhabitants of the city, receive treatment at this hospital. Longview now has between forty and fifty physicians.

"Respondent also owns and operates a general merchandise store at Longview similar to some of its stores in the South and at Weed, California.

"Respondent has carried on a national advertising campaign, advertising the advantages of Longview as a city in which to live, invest and locate industries. Approximately $225,000 has been spent by respondent and its subsidiaries in this national advertising. This advertising has been carried in periodicals having a national circulation, such as the Saturday Evening Post, American Magazine, Literary Digest, National Real Estate Journal, Scientific American, Manufacturers' Record, Wall Street Journal, Industrial Management, and in thirty-four metropolitan newspapers and in a number of lumber trade journals. Much advertising matter has also been issued and circulated by respondent in the form of pamphlets or booklets describing the origin, development and growth of this community, as well as prophesying as to its future.

"The purpose of this advertising campaign was to enable respondent to find a market for its many investments above described in the townsite of Longview, and adjacent land to the west, and thereby relieve it of the necessity of carrying large investments in many of these facilities, as had been its custom at its other operating points in the past. In one of these advertisements it was stated:

" 'A large body of land was necessarily acquired for our operations in the Pacific Northwest. The construction of a great many houses and buildings was necessary to provide proper facilities for our own people. As we began to work out our plans we found the location we had selected would lend itself to greater development and provide facilities larger than were required for our own use. Therefore, we concluded it was our duty and our desire to provide for a town that would be a desirable place in which many thousands of persons may live and do business. We have planned here a city that within the next five years should have a population of 25,000 and within the next ten years of 50,000 or more.'

"In other pamphlets and advertisements Longview is referred to as a 'nationally known city,' 'a city planned by experts,' 'the city practical that vision built' and as a city 'destined to take its place among the great cities of the Pacific Northwest.' In others, it was pointed out that 'Seattle grew in a single generation from a raw sawmill town to a city of 315,000,' and that Portland expanded from a modest town to a great metropolis of 258,000 people, and that 'much the same opportunity is now discernible at Longview,'

"The various advertisements describe in detail the development at Longview, setting forth its many advantages for industrial locations and as a place in which to live or make investments. Many of the advertisements contain photographs of buildings, industrial plants and residential and street scenes. The language employed is optimistic in tone and such as is best calculated to boost the city and to challenge the attention and interest of the reader who might become a Longview purchaser, investor or resident.

"This national advertising was a necessary and essential aid to respondent in the furtherance of its plan and intention of liquidating those investments at Longview which were not directly and permanently needed in its lumber manufacturing and selling operations.

"While the charter powers of the above-mentioned subsidiary corporations were in some instances more extensive than those necessary to authorize the doing of the development work and transactions above described, yet I find that the intention and primary object which respondent had in mind when they were organized was to do the things hereinabove mentioned, and that none of said subsidiaries has engaged in corporate activities other than those above described, and it has not been nor is it now respondent's intention to have them engage in any business other than as above described.

"In addition to respondent's expenditures toward the development of the Longview townsite, Mr. R. A. Long has very materially aided in this development out of his personal funds, having already expended approximately $690.000 and made plans for spending approximately $500,000 additional.

"The above sum already expended by Mr. Long privately includes, among others, the following items:

"Library building at Longview ..................$161,742.78
Landscaping of parks, playgrounds, and around
  schools and hospital ........................ 264,294.60
Pacific Highway approach to bridge across Cowlitz
  River .................................. 132,792.55
Golf club house .............................. 17,000.00
Thirty-five acres of ground for high school ...... 101,000.00

"In addition to the above Mr. Long has employed an architect to draw plans for the first unit of the high school at Longview. This building will cost approximately $500.000, and will be paid for by Mr. Long out of his private funds and given to the school district. The school district at this time is unable financially to supply this necessary school facility.

"Longview now has between 10,000 and 12,000 inhabitants. Kelso has increased its population from 2300 to about 10,000 since respond-

ent located at Longview, and Ranier, Oregon, across the Columbia, has increased from 900 to 1500.

"Longview as now laid out and developed presents an inviting and attractive appearance. It has a high class of citizenship, attracted there by the favorable living conditions and surroundings. Respondent has been able to procure the highest type of labor for its operations and has had no labor difficulties at Longview. About sixty-five per cent of respondent's employees at Longview are married men, and about twenty-two per cent of the employees now own their own homes. It is estimated that ultimately fifty per cent of the employees will own homes here.

"The high type of labor which has been attracted to Longview is reflected in the low labor turnover. During the six months preceding the hearing at Longview, in May, 1927, respondent's labor turnover there was approximately 4.6 per cent, which is much lower than the usual labor turnover in lumber operations in the Northwest. The labor turnover at the Longview mills before sufficient houses had been built, and when living conditions were not as good as now, was much higher, running as high as twenty-five per cent in 1923, eighteen per cent in 1924, twenty per cent in 1925 and twelve per cent in 1926. Labor turnover in lumber operations in the Northwest runs from twenty-five per cent to fifty per cent. The labor turnover at Weed, California, has varied from ten per cent to thirty per cent. A low labor turnover is conducive of increased production.

"More than one hundred of respondent's most important employees at Longview, including the key men, superintendents and foremen, have financed and built from their own resources homes costing from $5000 to $75,000. Possibly only one residence cost the latter sum; one cost $35,000, and the others less.

"Up to the date of the hearing herein 5186 acres of the original 14,000 acres in the Longview site have either been absorbed by actual use of respondent's operations or sold to outside capital. Up to this time respondent's subsidiaries have received for the land so sol.. approximately $3,600,000. The remainder of the land is for sale.

"A 700-acre tract along the Columbia River front of the townsite has been sold for a sawmill and manufacturing site to the Weyerhaeuser Timber Company, said to be one of the largest holders of timber in the world. The Weyerhaeuser Timber Company has extensive timber holdings near Longview and has already built a railroad for hauling its logs into this site. When its plant is built it is estimated that it will give employment to about 1500 men, which means bringing about 5000 more inhabitants to Longview, and that will materially aid the respondent in liquidating more of its investments in the townsite.

"Forty acres of land in the townsite have been sold to the Port of Kelso for the sum of $100,000, and five acres of land have been sold to the Standard Oil Company for the sum of $25,000.

"Mr. Nelson, the president of respondent, while testifying, expressed an opinion which, in substance, was to the effect that under any plan which respondent might have pursued in supplying the necessary living facilities to its employees at Longview it would have had invested in these facilities as much as it now has invested there. This opinion was also corroborated, in large part, by the opinion expressed by Mr. R. A. Long while testifying in the case. No contrary opinion was expressed by any witness.

"Mr. Nelson testified as follows:

" 'We are doing nothing at Longview except in a larger way than hundreds, and I would say almost to the thousands, sawmills located throughout the different sections throughout the United States, except the operation of the dredges; as I explained, we had to purchase them. We had them on our hands and we didn't know what to do with them. Now, it is true, selling off lots—we come in possession of that extra amount of ground there from an economic standpoint; it meant only the investment of the crude land that was not properly protected. It was the economical thing to do, not because we wanted to, and we are trying to sell it off as fast as we can when we can get a satisfactory or the right price for it.'

"I find the following facts bearing on the institution of this suit:

"Mr. and Mrs. F. J. Bannister own approximately one per cent of respondent's capital stock. Mr. Bannister was president of the company for some time prior, and up to August, 1923, when his resignation as president became effective. He continued as director the balance of the year and was re-elected director in 1924. Prior to that time he made no objection to the Longview development, but apparently was in harmony with the same, and helped plan and direct the greater portion of the development. When he resigned as president, although requested to give his reason for resigning, he declined to do so.

"During the summer of 1924 respondent decided to sell an issue of preferred stock. New York bankers underwriting the issue requested that respondent be reincorporated as a Delaware or Maryland corporation. This required the consent of all the stockholders. All of the stockholders except Mr. and Mr. Bannister consented and deposited their stock for this purpose. The Bannisters refused to deposit their stock or consent to the plan. Thereafter, after unsuccessful attempts on the part of Mr. Nelson, then president, to get Mr. Bannister to consent to the reorganization, Mr. Long asked Mr. Bannister to put a price on his stock. Mr. Bannister stated a price

in writing, but Mr. Long refused to pay the price. At the last conference between Mr. Long and Mr. Bannister on this subject Mr. Long, in effect, stated to Mr. Bannister that he did not know what would be done, but that they might have to go to court to have a price fixed upon the stock, and they considered this necessary only with reference to the shares standing in Mrs. Bannister's name; that he understood Mr. Bannister had indorsed his stock and deposited it, and that he was bound thereby, although he had later withdrawn his stock. Mr. Bannister thereupon said, 'That's a lie—that's an insult, a damned insult,' and left the conference. Shortly thereafter Mr. Bannister wrote Mr. Andrews, attorney for respondent, that if they desired to discuss the matter further they could do so with his attorney, Mr. Brewster.

"Further conferences were held between Mr. Bannister's attorney and respondent's attorney, in which respondent's attorney proposed that the plan of reincorporating the company be carried out and that they litigate the question of the value of the Bannister stock, but that the right of the respondent to dissolve should not be a litigated question. Mr. Bannister refused this proposal.

"Later, in October, 1924, the attorney for the Bannisters reported to respondent's attorney, in substance, that he did not think respondent's amendment of its charter in 1922 was legal, and that Mr. Bannister was anxious for him to take some action, and that he was going to 'crack down' on them, and again discussed the question of whether there was any way by which a purchase of Mr. Bannister's stock could be brought about.

"In November, 1924, respondent, being unable to procure the consent of the Bannisters to the original plan of organizing a Maryland corporation to take over all the assets of respondent, abandoned that plan, and in lieu thereof adopted and executed a plan which did not require the consent of the Bannisters. Under the latter plan a Maryland holding corporation was organized under the name of Long-Bell Lumber Corporation. The Maryland corporation then acquired from respondent's stockholders ninety-nine per cent of the issued and outstanding capital stock of the respondent company by exchanging therefor a certain amount of the shares of its own capital stock. This included all of respondent's capital stock except the shares held by the Bannisters. The preferred stock issue was then put out by the Maryland corporation and not by respondent.

"In January, 1925, the attorney for the Bannisters again took up with respondent's attorney the question of the sale of the Bannister stock, but received no encouragement. Numerous other conferences were had by the attorneys in an attempt to agree upon a price for

the Bannister stock or to agree upon a method of arbitration, but to no avail.

"Later the matter which forms the basis of this suit was laid before the Attorney-General by the attorney representing Mrs. Bannister.

"The Attorney-General held two conferences, at which he heard the matter fully stated and argued by counsel representing Mrs. Bannister and those representing respondent, and printed briefs were filed. The attorneys representing Mrs. Bannister stated in their brief the following:

"'Representing Mrs. Bannister, we stand ready to furnish the Attorney-General of the State of Missouri with a bond protecting the State against any loss by reason of this action. We also stand ready to furnish the Attorney-General with any needed information, and do under his supervision any work that we may be assigned.'

"Later, on April 9, 1926, the Attorney-General notified one of respondent's attorneys by letter that he had decided to bring the suit.

"Mr. Bannister did not testify as a witness in this case. Mr. Bannister was present at all the hearings and sat with his counsel, who assisted the Attorney-General in the presentation of the testimony.

"The Attorney-General testified that on account of the fact that all of his appropriation for such uses had been either used or pledged in other cases, and because he had found it unsatisfactory to wait for appropriations from the Legislature, he told the attorney for the Bannisters at the outset that we would require the Bannisters to give a bond to secure the costs of the proceeding if such a suit were filed. He further testified that such a bond had been given and filed with him and made payable to him as Attorney-General or his successor in office.

## "Conclusions Of Law.

"I. The legal proposition which should be first determined is whether or not respondent's charter, as amended July 10, 1922, is valid.

"(No attack is made by informant in the information or in his brief concerning the 1907 amendment of respondent's charter, as set forth above, although it would appear that many of the objections now asserted against the 1922 amendment would apply with almost equal force against the amendment of 1907. If the 1922 amendment is found to be valid it would, of course, supersede the 1907 amendment. If the 1922 amendment is found to be invalid the charter, as amended in 1907, would, perhaps, stand, at least until a proper attack is made against it.)

"As we understand informant's contention, it, in effect, is that a manufacturing and business corporation cannot be granted the power under the Missouri statutes to carry on more than one of the purposes provided by the several clauses of Section 10151 (of Art. VII, Chap. 90), Revised Statutes 1919, unless the group of purposes to be carried on are related; that respondent's charter, as amended in 1922, violates this principle, and is, therefore, invalid.

"After a careful study of the statutes involved and the authorities cited we are unable to concur in informant's view.

"In order to clearly comprehend the meaning of Section 10151, supra, other statutes dealing with the same subject-matter should be examined and considered in connection therewith.

"Section 10144 of the same article contains the following language:

" 'Any three or more persons, who shall have associated themselves by articles of agreement in writing, as provided by law, for any of the purposes included under Section 10151, may be incorporated under any name or title, either designating such business or when followed by the word company, corporation or incorporated. The article of agreement shall be set out: First, the corporate name of the proposed corporation, which shall not be the name of any existing corporation heretofore incorporated for similar **purposes**; . . . seventh, the **purposes** for which the corporation or company is formed . . . .' (Bold-faced type ours.)

"Section 10151, supra, is as follows:

" 'Corporations may be created under this article for any of the following purposes:

" 'First. To carry on any kind of mining, mechanical, chemical, manufacturing, smelting, printing, coal oil or petroleum business.

" 'Second. To encourage and promote agriculture and the improvement of stock, and for these purposes may establish fairgrounds.

" 'Third. To construct toll bridges.

" 'Fourth. To erect hotels, halls, market houses, warehouses, exchange and other buildings and for the purpose of purchasing, owning and renting buildings already erected.

" 'Fifth. To build wharves, docks, grain elevators, levees and to construct canals and embankments for the reclaiming of lands.

" 'Sixth. To convey and transport persons and freights on land or water by any mode of conveyance whatever.

" 'Seventh. To construct and operate horse railroads.

" 'Eighth. To purchase and use fire engines, hose, hooks and ladders and all other apparatus necessary or useful to prevent and extinguish fires.

" 'Ninth. To supply any town, city, district, neighborhood or village with gas or water.

" 'Tenth. To establish steam or other ferries.

" 'Eleventh. For any other purpose intended for pecuniary profit or gain not otherwise especially provided for, and not inconsistent with the Constitution and laws of this State; *Provided,* that nothing in this section shall be construed to authorize the incorporation of a bond investment company or association to issue bonds or debentures based upon payments upon the installment plans, nor any company which savors of the character of a trust company, bank, saving fund, building and loan or fiduciary company.'

"Section 10159 of the same article contains the following language:

" 'Any corporation now existing or which may hereafter be formed for any of the purposes contemplated by this article, may . . . extend its business to *any other purposes* authorized by this article . . .'

"The word 'authorized,' as used in the phrase 'may extend its business to any other purposes *authorized* by this article,' is evidently used in a descriptive generic sense and intended to include the enumerated purposes set forth in Section 10151, supra, as well as the unenumerated ones permissible under the eleventh clause of said statute. Each and all of said purposes may properly be said to be *authorized* by said article.

"The word 'any' in the phrase, 'any of the following purposes,' as used in Section 10151, supra, should not be given the limited singular meaning contended for by informant, but the phrase should be construed to mean 'any one or more of the following purposes.'

"This, we think, is the clear legislative intent when all the above statutes are considered together. Section 10144, supra, expressly providing that the original articles of agreement shall 'set out the purposes for which the corporation is formed,' clearly negatives the idea that a corporation formed under the article must be limited to a single purpose. And the provision in Section 10159, supra, providing that corporate charters may be amended by extending the business to any other purposes, etc., shows beyond question that it was intended that a corporation might carry on at least more than one purpose by having its charter amended. No justifiable reason would appear for permitting a corporation at any given time to receive by the process of amendment greater charter power than it could then receive by original incorporation.

"No principle underlying sovereignty or public policy would demand that such corporate charter power should be established by either method to the exclusion of the other. And we find no language in the article indicating any such legislative intent.

"The word 'any' is not an unyielding term, but one which readily yields to the legislative intent as reflected by the context of the act.

And when the context so indicates, the word may be construed to mean 'one or more,' 'several,' 'some' or 'an indefinite number,' etc. [1 Bouvier's Law Dictionary, p. 205, title 'any;' 1 Century Dictionary, p. 253, title 'any;' Platt v. City of Payette (Idaho), 114 Pac. 25; West Chicago Park Commissioners v. McMullen, 134 Ill. 170, 1. c. 179-180; Glen Alden Coal Co. v. Scranton, 282 Pa. St. 45, 1. c. 48; Pioneer Construction Co. v. State Bank (Okla.), 158 Pac. 894; Klotz v. Bank (Ind.), 134 N. E. 220, 1. c. 222.]

"Furthermore, the applicatory rule of construction in force in Missouri would seem to leave no room for contention. We are admonished by statute to so construe statutory words importing the singular number as to include the plural (several) 'unless it be otherwise specifically provided or unless there be something in the subject or context repugnant to such construction.' [See Secs. 7055 and 7056, R. S. 1919.] In the present instance it is not 'otherwise specifically provided' nor is there anything 'in the subject or context repugnant to such construction,' but the context clearly favors such construction.

"We therefore have no hesitancy in concluding that manufacturing and business corporations organized under Article VII, Chapter 90, Revised Statutes 1919, may, either through the process of original incorporation or later by the process of charter amendment, or as the combined result of both processes, be given the right to carry on one or more, or any combination, of the many purposes provided by Section 10151, supra.

"In further corroboration of the soundness of the above construction is the fact that the Secretary of State of Missouri, whose duty it is to grant corporate charters under said statutes, has, during the past twenty years and more, so construed them. Such conduct on the part of this important executive official of the State, while not conclusive upon the courts, is always entitled to and should receive much weight. [Ross v. Kansas City, St. J. & C. B. Ry. Co., 111 Mo. 18; State ex rel. v. Roach, 269 Mo. 437; State ex rel. Union Electric Light & Power Co. v. Baker, 293 S. W. 399; State ex rel. v. Bank, 249 S. W. 619, 1. c. 623.]

"A further significant factor, though not controlling, but one which is nevertheless entitled to respectful consideration (Hall v. Sedalia, 232 Mo. 344, 1. c. 355), is the fact that a subsequent General Assembly so interpret said statutes. See Laws 1921, pp. 267-8. This is an act relating to consolidation of certain corporations, and providing that certain enumerated statutes providing for consolidation of corporations 'shall apply only to private corporations organized for some or all of the purposes permitted to 'manufacturing and business corporations' by subdivisions first, second, fourth, fifth and eleventh

of Section 10151 of the Revised Statutes of the State of Missouri for the year 1919.' (Bold-face type ours.)

"The authorities relied upon by informant in support of his contention, viz.: Ramsey v. Tod, 95 Tex. 614; Johnston v. Townsend, 103 Tex. 122, 124; New Nueces Hotel Company v. Weil Bros. (Tex.), 243 S. W. 731; Staacke v. Routledge (Tex.), 175 S. W. 444; State ex rel. v. Taylor, 55 Ohio St. 61; State v. Stock Company, 38 Ohio St. 347; Burke v. Meade, 159 Ind. 252; Williams v. Citizens Enterprise Co., 25 Ind. App. 351; Dancy v. Clark, 24 App. Cas. (D. C.), 487; 14 C. J. 130, sec. 121; Fletcher's Cyc. Corp., sec. 117, p. 200, will upon examination be found to be not in point on the exact question here involved.

"The corporation statute underlying the Indiana cases (Burns' Statute 1894, sec. 5051; also, same section, Burns' Stat. 1901) provides that the certificate asking for a charter 'shall include any or all of the purposes stated in **any one** of the above-named subdivisions of this section.'

"The statute underlying the Ohio cases (Revised Statutes Ohio, 1890, sec. 3236) provides that the articles of agreement must contain 'the **purpose** for which it is formed,' and Section 3238 (a) of the same Ohio statute provides 'nor shall any corporation by amendment change substantially the original **purpose** of its organization.'

"The Texas statute underlying the Texas cases provides that the charter should 'set forth the **purpose** for which it is formed.'

"The statute underlying the District of Columbia case (Comp. Stat. D. C. 1894, page 126, sec. 36; Secs. 605-6, Code of Law for the District of Columbia, amended to June 7, 1924) provides that the certificate shall state 'the **object** for which it is formed.'

"When the above several statutes are compared with the Missouri statutes, which require the articles of agreement to state 'the **purposes** for which the corporation or company is formed' and provide that the Missouri charter may be amended by extending 'its business to **any other purposes** authorized by this article,' it is at once apparent that those decisions cannot be considered as persuasive here. (All above emphases ours.)

"The citation from Corpus Juris and Fletcher's Cyc. Corp., so far as they purport to support a contrary rule, will, upon examination, also disclose that they are based upon cases discussing statutory provisions unlike the Missouri statutes.

"II. Neither do we find any language in the Missouri statutes justifying informant's assertion that corporations organized under Section 10151, supra, for more than one purpose are limited to such purposes only as are related. And it is perhaps well that no such language was used. It would, indeed, be a difficult task, in this age of rapid industrial develop-

ment, for the Secretary of State to ascertain, by merely looking at the cold letter of the corporate articles of agreement (the only information before him when he acts) whether the purposes therein stated were or were not related or such as might become so. It is a well-known fact that present-day industrial and scientific progress takes pride in turning to profit many items which but yesterday were either overlooked or listed as waste products, and it would take a very highly trained technical mind to be able to even make a close guess as to what activities might or could be properly related in an industrial activity.

"As a practical proposition most Missouri manufacturing and business corporations organized under Section 10151, supra, no doubt confine their respective operations to activities more or less related or germane to the main objective, but this results from basic economic reasons and choice of original incorporators, and not from statutory command.

"And while from the cold letter of respondent's amended charter some difficulty might arise in passing in advance upon the question of whether they were all related or cognate powers, yet after the complete picture has been developed by the light of the facts proven in this case we have no hesitancy in saying that those purposes as exercised by respondent in its activities at Longview under the conditions then and there existing, have each and all been more or less essentially related to the business-like establishment and maintenance of its main purpose, to-wit, the manufacture and sale of lumber on a very large scale.

"III. Having reached the conclusion that respondent's charter as amended in 1922 is in every way valid, and that respondent was thereby authorized to do the things therein expressed or implied, we next come to the question of determining whether the activities of which informant complains are within those charter powers.

"Before considering the legal questions raised by the specific activities, it is well to bear in mind that this is a proceeding by the Attorney-General to oust or prevent the respondent from exercising certain powers, and it is not a proceeding by stockholders attacking the methods employed by the directors in exercising those powers.

"Our chief concern in this proceeding is to ascertain whether charter power exists in respondent to carry on certain activities, and we are not here especially concerned with the methods used in carrying out those powers.

"Mention is made of this because informant in his brief at many places complains of the *extent* of certain business activities.

It would seem to us that if the State has granted the power to a corporation to build a logging railroad, build a hotel or develop a townsite, the cost of the railroad, hotel or townsite or the method and extent of the development would not be a proper subject for investigation in this proceeding which was brought for the purpose of determining the question primarily of whether there has been an abusive exercise of an unauthorized power or franchise.

"It is also well at this point to consider the rule applicable to implied powers. Little difficulty will be encountered in ascertaining whether a given activity is within the express charter powers, once the language of the charter is known, but a much more difficult problem is presented when it becomes necessary to determine whether a given activity is within the implied corporate powers.

"The applicable rule appears to be well settled and was tersely and accurately stated by WALKER, J., speaking for Court en Banc in the case of State ex inf. v. Missouri Athletic Club, 261 Mo. 576, 1. c. 599, as follows:

"'(Implied powers) 'are defined to be those possessed by a corporation not indispensably necessary to carry into effect others expressly granted, and comprise all that are appropriate, convenient and suitable for that purpose, including, as an incidental right, a reasonable choice of the means to be employed in putting into practical effect this class of powers.'

"The same was again stated in the fairly recent case of State ex rel. v. Bank, 249 S. W. 619, 1. c. 622.

"Stated another way, 'a power is implied when "reasonably necessary" to enable the corporation to accomplish the objects of its creation,' provided always, of course, that those objects are such as are recognized and permitted by the charter granting power. Furthermore, any particular act, to be justified under implied power. must be 'directly and immediately appropriate to the execution of the specific powers granted by the charter, and not bear merely a slight or remote relation to them.' [2 Fletcher, Cyc. Corp., pp. 1768 and 1770. pars. 793 and 795.]

"While as above stated, little difficulty is met in ascertaining the rule, a difficult problem often presents itself in applying the rule.

"In this behalf it has been very appropriately said:

"'The rules laid down above as to implied powers are well settled and are, at the present day, not even questioned by courts or writers. The difficulty comes in applying the rules. It is easy to say that a power is implied if it is "reasonably necessary" to the exercise of express powers, but there is no test to decide whether a particular act, done by a particular corporation, under particular circumstances,

is "reasonably necessary." Of course, many acts are clearly on one side of the line or the other. But there are many close to the dividing line, which occasions more or less confusion in the decisions. The result is the rule that whether an act comes within the implied powers of a corporation "must be determined in each case from all its facts and circumstances." In an early Massachusetts case, Chief Justice SHAW said: "The extent and limits of these implied duties and powers, in the absence of positive provision in the legislative act, by which the power is granted, can only be determined by considering what is reasonable in each case." "The authority of a corporation to perform a particular act is always dependent to a very considerable extent upon the facts and circumstances existing at the time when it is proposed to perform the act." "Exceptional circumstances or extraordinary conditions may make it necessary to the proper prosecution of the business of a corporation that it shall be accorded implied power to perform acts beyond its express power, and which, except for the prevailing conditions, would be wholly unwarranted." ' [2 Fletcher, Cyc. Corp. 1778, par. 802, and many cases therein cited.]

"Keeping in mind the above admonitions of the authorities we shall next proceed to examine and measure the specific acts of which complaint is made.

"IV. The specific activities of which informant complains are as follows:

"1. Purchase of the 14,000-acre tract and the development of the Longview townsite;

"2. Guaranteeing the drainage and improvement bonds;

"3. Helping organize a bank and subscribing for part of the stock thereof;

"4. Engaging in the real estate business;

"5. Building and operating Monticello Hotel;

"6. Operation of the busses, ferry, electric-light and water distributing systems;

"7. Building and operation of the railroad;

"8. Expenditures made in advertising the advantages of Longview to outside investors;

"9. Publication of the newspaper;

"10. Ownership of the capital stock of the subsidiary corporations, including the dredging company;

"11. Ownership of stock in a local loan and investment company.

"The facts bearing on each of the above-named activities will be found fully stated in the foregoing finding of facts and, for that reason, need not be here fully restated. Reference will be made to

some of the essential and controlling facts as we now discuss in the above order the legal questions presented by those activities.

## "V. Purchase of the 14,000-Acre Tract and The Development of the Longview Townsite.

"The 1922 amended charter expressly authorizes respondent 'to purchase, develop and handle townsites in connection with or tributary to lumber manufacturing plants.' The amount of land which the corporation may purchase for this purpose is not limited by the charter. Neither is the extent of the townsite development fixed by the language of the charter.

"Informant contends that the above language is only declaratory of the implied power respondent would have had in any event to purchase and develop such a townsite as was reasonably necessary to house its employees, and that, therefore, the townsite and its development should be limited to that size. We are aware that respondent, under the existing conditions, would have had the implied power, even in the absence of the above charter provision, to have purchased and developed a townsite and to have provided living facilities suitable for the needs of its employees. [Steinway v. Steinway & Son, 40 N. Y. Supp. 718; 2 Fletcher, Cyc. Corp. 1768, par. 792 (4).] But we are unable to agree with informant that the above express charter power should be so limited. We are of the opinion that the size or acreage to be included in any townsite authorized by the above express language of its charter was one left to the business judgment and discretion of the directors of the corporation, and that the size of the townsite was of no concern to the charter-granting sovereign or the public interest.

"But if our conclusion in this regard should be found to be incorrect, yet there is still ample justification, upon the facts of this record, for the purchase of the 14,000-acre tract. It is true respondent acquired more land in the Longview Valley than was absolutely necessary for the mere location of its mills and employees' homes, but it did not acquire any more land than proper drainage, diking and other protective matters at the time demanded. It was just as essential under the circumstances involved that the mill and townsite be properly drained, diked and protected from undesirable encroachment as it was that adequate ground be secured upon which to locate the mills and houses, and the right to purchase such additional land for such purposes was we think clearly within respondent's implied powers.

"It is true that after the diking and drainage system had been completed in the valley it was no longer necessary that the land, other than that required for the millsite, etc., be held permanently by respondent, provided desirable purchasers could be found. But, as

above disclosed, it was very essential during the preliminary and formative period of this large industrial project that respondent control this entire tract.

"Neither do we find any language in the charter which limits the manner, method or cost of the development of this authorized town-site. That was a matter to be determined by the judgment and enterprise of its board of directors. It does not appear that any director or stockholder, at the time, took exception to the plan pursued. It is the opinion of the writer that the officers and directors are to be commended, rather than criticised, for the rare business judgment displayed in meeting and successfully solving the many difficult problems which arose in connection therewith.

## "VI. Guaranteeing the Drainage and Improvement Bonds.

"Informant's attack upon this activity appears to be based upon the assumption that respondent did not have the power to purchase the 14,000-acre tract and develop the Longview townsite. In his brief he states that 'if' respondent did not have these powers, 'then it follows that it was not authorized to indorse and guarantee the payment of the drainage and improvement bonds.'

"We have reached the conclusion, however, that respondent did have the power to purchase the 14,000-acre tract for the purpose hereinabove indicated and to develop the Longview townsite in the manner pursued. That would appear to be a sufficient answer to this point. However, in passing, it may be best to call attention to other controlling factors.

"The diking and drainage work for which the drainage bonds were issued was of such vital importance to the protection of respondent's mill site and the townsite that respondent undoubtedly had the power to do this work itself and, if need be, to borrow money to pay for the same. It no doubt could have borrowed the necessary amount and given a direct mortgage on the land affected to secure the loan. Instead of financing the drainage work in that way it chose to do it in another way. It caused a local drainage district to be organized under the Washington law. The drainage district then contracted for the work; respondent did the work and the drainage district issued its bonds and delivered same to respondent in payment of the work. Thereupon respondent indorsed the bonds and guaranteed their payment and sold the same and reimbursed itself for the expense incurred in doing the work. At that time respondent owned approximately all the land in the drainage district, and under all the circumstances here shown we think respondent was acting well within its implied powers when it guaranteed the payment of the bonds.

"The same principle is involved with reference to the local improvement bonds. They were issued by local improvement districts for work which it was necessary that respondent have done in order that its townsite be properly developed.

"Respondent was directly and financially interested in having this improvement work done at a fair price because the land which it then owned in the townsite would ultimately have to carry the financial burden thus imposed. In order to encourage responsible contractors to bid on the work and also to induce close bidding, respondent in advance agreed to buy all bonds issued for such work. In this manner it became the purchaser of the local improvement bonds, and thereafter, in order to liquidate its investment therein, sold the same after guaranteeing their payment.

"It appears to be well settled that 'whenever a corporation has the power to take and dispose of the securities of another corporation, of whatsoever kind, it may, for the purpose of giving them a marketable quality, guarantee their payment.' [14a C. J. 742, par. 2789 (2).]

## "VII. Helping Organize a Bank and Subscribing for Part of the Stock Thereof.

"This point is merely raised in informant's brief, without further comment. We are, therefore, in doubt as to whether informant intends to press the point for decision. The same may also be said concerning some of the other points which are raised but not discussed in informant's brief. Since it is, however, our duty, as specified in our appointment, to make recommendations to the court on all points of law involved, we deem it our duty to make recommendations on all legal questions raised, even though no specific suggestions are made in support thereof.

"It appears to us that this question is a moot question so far as the issues involved in this suit are concerned. Informant on page 117 of his brief has stated that he will not ask for judgment of ouster or the fixing of a fine, but, in substance, only for a judgment requiring respondent as speedily as possible to liquidate its outside investments and cease the abuse of corporate rights and the usurpation of corporate franchises. We interpret this to mean corporate powers now or at the institution of his suit being illegally used. It appears that respondent sold its stock in this local bank a year or more before this suit was begun and that it has no intention of again owning stock in a bank.

"Under such circumstances we might well pass the point as being a moot question.

"However, we may be mistaken as to informant's intention concerning this point and possibly for that reason it should be discussed on its merits.

"The facts disclose that in 1923 in the early period of this development, banking facilities were not available at Longview. That respondent for the purpose of protecting its pay-rolls and receiving and protecting employees' deposits assisted in organizing this small bank by subscribing for eighty per cent of the capital stock. It does not clearly appear, but the inference is justifiable, that this was the only means of procuring suitable banking facilities for this embryo community and that respondent thus temporarily assisted in establishing a bank until outside capital could be induced to take it over. As soon as the development work had reached a stage where it became apparent to outside capital that the Longview settlement would support a bank respondent was able to and did promptly dispose of its stock.

"At the time this bank was organized the development of Longview was still in its primary stage and any banking business then conducted by the bank were such as were necessarily limited to respondent's own affairs and the deposits of its employees. Its action therefore under the peculiar circumstance then existing, in thus **temporarily** assisting in causing to be provided this economic safeguard, necessary not only for the proper protection of respondent's funds used in meeting current pay-rolls, but also for the safekeeping of its employees' funds, is, we think, not subject to just criticism. One of the prerequisites for ground of forfeiture for misuser of corporate powers is that the misuser must be 'willful and repeated.' [State ex inf. Attorney-General v. American Can Co., 4 S. W. (2d) 448, l. c. 454.]

"It is true, of course, that respondent has no charter power to engage in the banking business as a continuing or permanent activity, but we are unable to say that this temporary transaction under the then existing conditions and completed a year or more before the institution of this suit would now furnish any just basis for ouster or fine. No authorities have been cited that would warrant such a judgment, and after diligent search we have found none.

"## VIII. Engaging in the Real Estate Business.

"Respondent's real estate operations were confined solely to the purchase and development of the townsite, building and selling or renting homes to employees and the erection of a few business buildings for the first merchants and trades people, and the sale or attempted sale of those portions of the larger tract which for reasons already given were not needed as permanent holdings.

508

"The language of the charter authorizing respondent 'to purchase, develop and handle townsites,' etc., together with the implied powers above discussed, in our opinion, gave ample authority for all the real estate activities shown by this record.

"It would be difficult to conceive of a situation under which a townsite could be 'developed and handled' and homes supplied employees without engaging in the real estate business.

### "IX. Building and Operating Monticello Hotel.

"The facts disclose that it is customary for large lumber manufacturing companies to build and operate hotels near the site of their operations when these facilities are not otherwise available, and that suitable hotel facilities are direct and essential aids to the business-like operations of such industries.

"As we understand informant, he does not question the implied power of respondent to build and operate a hotel under such circumstances, but directs his attack at the cost and size of the Monticello Hotel at Longview, which was built and is now operated by respondent.

"Respondent having the implied power, under the circumstances now held in judgment, to build and operate a hotel, the size of the hotel was a problem to be determined by the good-faith judgment of respondent's directors and it was not in our opinion a matter of any concern to the state granting the charter. But even though it were, we would be unable to say under the facts disclosed by this record that the hotel as built, equipped and at present maintained and operated is too large or that more money was invested in this facility than good business judgment demanded.

### "X. Operation of the Busses, Ferry, Electric-Light and Water Distributing Systems.

"It is a sufficient answer to informant's complaint about the acquiring and operation of the ferry, busses, electric-light and water distributing systems at Longview to say that these activities are expressly authorized by the language of respondent's 1922 amended charter, which amended charter was in effect before any of said activities were begun.

### "XI. Building and Operation of the Railroad.

"The charter also expressly authorizes respondent 'to purchase, construct or otherwise acquire and to operate . . . engines . . . railroads or other means of transporting lumber, lath, logs or shingles or other wood products or the by-products of any of said manufacturing operations, or for transporting other freight or transporting passengers, except that the company shall not maintain or operate any railroad in the State of Missouri.'

"The facts disclose that the railroad which respondent built and now operates through its subsidiary, the Longview, Portland & Northern Railway Company, was indispensable to its lumber manufacturing business at Longview. It was the only practical means of transporting its logs from its timber tract to its mills. Outside capital refused to build and operate the road or to provide such transportation facilities and the very necessity of the situation compelled respondent to build and operate the same. We are not here dealing with a railroad in the usual sense or meaning of that term. The railroad here involved although duly incorporated as a common carrier (for the reasons heretofore stated) is engaged almost entirely in handling the transportation matters of respondent. And the ruling we make on this point is based upon the peculiar facts of this case. The business of the railroad, other than that vitally and necessarily connected with respondent's lumber manufacturing operations and its townsite development, is insignificant. Under these circumstances we have no hesitancy in saying that this activity is well within its charter powers.

## "XII. Expenditures Made in Advertising the Advantages of Longview to Outside Investors.

"As shown by the foregoing facts, respondent had much property for sale at Longview, growing out of the townsite development. In order to attract purchasers it was necessary that the many advantages of Longview from an investor's standpoint be given publicity. This was done through the medium of pamphlets, newspaper and magazine advertising. Since this advertising campaign was started many important sales have been made by respondent. Among the more important sales was the sale of the electric-light and waterworks distributing systems at a profit of approximately one million dollars. Many other investors have been attracted to Longview. Out of a total of 2100 homes used by employees there, approximately one-third are owned by respondent, one-third by employees and one-third by outside capital. While it is no doubt impossible to trace directly the result of this advertising it is reasonable to assume that it has been a very necessary and essential aid in bringing about sales of respondent's properties and an aid to respondent's policy of liquidating certain holdings which it does not desire or need to keep as permanent investments.

"A corporation having property for sale undoubtedly has the implied power, as an aid in bringing about sales, to expend money in advertising the same. [2 Fletcher, Cyc. Corp. 1787, par. 813; Liebke v. Knapp, 79 Mo. 22.]

"The amount to be expended and the kind of advertising to be used are matters resting largely within the good-faith discretion of

the board of directors. And so long as the advertising tends to aid in the sale of commodities or property in which the corporation has the power to deal we fail to see where it is a matter of any concern to the State granting the corporate charter.

### "XIII. Publication of the Newspaper.

"The newspaper published by respondent in the early stages of the Longview development, as will clearly appear from a reading of the copies of the same offered as exhibits herein, was primarily an advertising and boosting medium for the advancement of respondent's interests in this locality. It might well be justified under the respondent's implied power to expend money for advertising, which we have discussed in the foregoing paragraph.

"Furthermore, since respondent sold this newspaper in 1925, and before this suit was instituted and has no intention of again publishing a newspaper, it would appear that, for the reasons given in Paragraph VII above, this is also a moot question.

"For this reason, therefore, as well as the one first given, we are of the opinion that this point should be ruled against informant.

### "XIV. Ownership of Stock in Subsidiary Corporations.

"Informant further contends that respondent violated its charter powers in owning the stock in the various subsidiary corporations which it caused to be organized to carry on the various portions of the work as detailed in the foregoing finding of facts.

"It will be recalled that each and every kind of business carried on by these various subsidiaries (excepting the present work being done by the dredging company, which we will discuss hereinbelow) was only such business as respondent could, under its charter powers, have carried on directly. From the evidence it further appears that there is no intention or likelihood of any of said subsidiaries engaging in any other business activities different from those now carried on.

"Paragraphs 6 of respondent's 1922 amended charter reads as follows:

"'To purchase or otherwise acquire and to hold and own  . . . stocks, bonds and other obligations of any corporation formed for, or then or thereafter engaged in, or pursuing, any one or more of **the businesses above mentioned or owning or holding any property which the company might lawfully own or hold.''** (Emphasis ours.)

"The above charter language but states the rule in force in Missouri at the time the charter was amended and these subsidiaries were organized. At least since the decision of the case of State ex inf. v. Railroad, 237 Mo. 338, it has been the settled law of this State that a corporation (unless prohibited by express statute) could own stock

in another corporation when the purpose of such other corporation was 'to facilitate the business for which' the stockholding corporation was chartered (State ex inf. v. Railroad, supra, l. c. 350). In that case, a proceeding by quo warranto, the railroad company was permitted to own practically all of the stock of two coal mining companies and an elevator company.

"This exact question was again before this court in the case of State ex inf. v. Railroad, 241 Mo. 1. In that case, a quo warranto proceeding, instituted by the then Attorney-General, the right of certain railroads to own stock in an express company and in a company operating refrigerator cars was challenged. The court said at page 13:

" 'Both companies [the express and refrigerator companies] are engaged in business which the railroad company could carry on itself, and if it could do so directly it may do so indirectly by owning stock of the companies engaged directly in the business.'

"Applying the above rule to the facts of this case, it would appear that since respondent could carry on directly the various business activities carried on by these subsidiaries it may do the same thing indirectly by owning the stock in these subsidiaries.

"Informant, in support of this proposition, contends that respondent's acts in owning practically all of the stock of these different subsidiary corporations violates Section 7 of Article XII of the Missouri Constitution, and also violates the well-established public policy of the State. Many cases are cited which we have carefully read and considered. Most of the cases are from other states, and none of the Missouri cases cited conflict with or in any manner overrule the two above-cited cases by this court, en banc. The above-mentioned constitutional question was squarely passed upon by this court in the above case of State ex inf. v. Railroad, 237 Mo. 338, and the ruling thereon was against informant's present contention. It thus appears that instead of the stock ownership in these subsidiaries under the circumstances now held in judgment being against the public policy of this State, as contended by informant, the same is clearly within the public policy as declared by the above cases.

"And while it has no bearing on this instant case, it is interesting to note that the Legislature of this State has, since the occurrences now held in judgment, greatly extended the above public policy of the State by expressly providing that manufacturing and business corporations organized under Section 10151, supra, may be given the charter power to purchase and hold shares of capital stock 'created by any other corporation or corporations of this State or any other state.' [Laws 1927, p. 394.] And while, as above stated, this recent statute is not controlling here because respondent's charter has not

been amended to acquire this extended power as provided by said statute (as might now easily be done), yet it clearly shows the trend of the public policy of this State.

"The fact that the subsidiary known as the Longview Dredging & Construction Company, in a good-faith attempt to find a purchaser for its remaining dredges, has placed two of them temporarily in Government contract work on the Sacramento River does not, we think, render the respondent subject to the charge that in this respect it is unlawfully usurping charter powers or violating its charter rights. As pointed out in the finding of facts respondent has, since the finishing of its own dredging work, attempted to sell these dredges; that they depreciate more when lying idle than when in use; that they were thus put in temporary operation to aid in finding a purchaser, and to save unnecessary depreciation.

"While it is true respondent would have no right under its charter to engage permanently in doing dredging work, other than its own, yet we see no reason why it may not thus conserve its property and temporarily operate the same while engaged in a good-faith endeavor to liquidate its investment therein. The situation is analogous to one in which a corporation, in an attempt to collect a debt, may acquire and temporarily hold and operate property which, under its charter, it would not have the permanent right so to do. This general rule is stated in 2 Fletcher, Cyc. Corporations, page 1768, paragraph 792 (2), as follows:

" 'The courts are very liberal in holding all reasonable acts of a corporation in connection with its collection of debts to be within its (implied) powers, and there is little conflict in the decisions. Thus, corporations may purchase property, or sometimes run a business temporarily, to collect a debt, where otherwise it would have no power to do so.'

"It would seem that if a corporation has the implied power to temporarily engage in outside business activities to conserve or liquidate its intangible assets, such as the collection of debts, it certainly should possess like power to conserve or liquidate such tangible assets as it no longer needed or used in the conduct of its business.

"We therefore conclude that the temporary activities mentioned are within respondent's implied powers.

## "XV. Ownership of Stock in a Local Loan & Investment Company.

"It is we understand, conceded by informant that respondent, under the facts of this case, had the implied power to build homes and living facilities and sell or rent the same to its employees. Such implied power seems to be well established. [Steinway v. Steinway & Son, 40 N. Y. Supp. 718; 2 Fletcher, Cyc. Corp. 1768, par. 792 (4).]

"Having this implied power it would necessarily follow that respondent could exercise the same by either itself building the houses and selling or renting the same to its employees or by doing the lesser thing, to-wit, render financial aid by way of loans to others who would use the money for that purpose. And having the power to do such business directly it also had the power to do the same indirectly by purchasing stock in a company engaged in such business. [See authorities cited in the preceding paragraph.]

"The facts disclose that the Longview Loan & Investment Company was organized primarily for this purpose, and that its business activities are confined principally to that line of business. So long as that situation continues we think respondent has the right to assist in rendering such financial aid by purchasing and holding stock in said company.

## "XVI. In Conclusion.

"We have carefully and painstakingly considered the legal questions thus raised by informant and the many authorities cited by the able counsel appearing for the respective parties. In addition we have made an independent and careful research into the authorities on the various legal aspects of the case. The case is undoubtedly an unusual one, both from the standpoint of the facts involved and the many legal questions presented. A similar set of facts will not be found in any adjudicated case. A clear understanding of many of the legal questions involved can be had only after the facts concerning this gigantic industrial activity in all its complex phases are fully understood and the many difficulties and obstacles, which in the early stage of the development stood in the way of this proper and successful installation, are fully comprehended.

"Reference is made in respondent's brief to the activity of private persons in helping to instigate and later to prosecute this suit. But this question falls out of the case if the conclusions reached above are sound. The effect of such private activities in matters of this kind has been but recently determined by this court in the case of State ex inf. Attorney-General v. American Can Co., 319 Mo. 456, 4 S. W. (2d) l. c. 454, and there is, therefore, no necessity for further discussion herein.

"For the foregoing reasons I therefore recommend that all relief sought by informant be denied, and that judgment be entered in favor of respondent."

For the reasons above stated all relief sought by informant is denied and judgment entered for respondent. All concur, except *Gentry, J.,* not sitting.